Hank MEREDITH, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 94–SC–1029–MR.

Supreme Court of Kentucky.

Dec. 18, 1997.

As Modified on Grant of Rehearing Feb. 19, 1998.

88

Julie Namkin, Assistant Public Advocate, Frankfort, for Appellant.

A.B. Chandler, III, Attorney General, Paul D. Gilbert, Assistant Attorney General, Frankfort, for Appellee.

STEPHENS, Chief Justice.

Appellant, Hank Meredith, was indicted in the Franklin Circuit Court for capital kidnapping, capital murder and rape in the first degree. Following a fifteen (15) day trial, the first degree rape charge was dismissed due to insufficient evidence and the jury was unable to reach a verdict on the remaining charges. On retrial, the jury found appellant guilty of capital kidnapping and capital murder. Appellant received sentences of life without the possibility of parole for twenty-five years on the kidnapping charge and life imprisonment on the murder charge, to run concurrently. Appellant appeals to this Court as a matter of right.

On September 25, 1991, Danville Police Detective Downs received a missing persons report regarding Teresa Larsen, who had not been seen since the morning of September 22, 1991. In the course of investigation, Detective Downs found Larsen's car parked at a truck stop and learned that the woman driving the car had gotten into a semi-truck with an unidentified man.

During this same time period, Larsen's sister and several members of Larsen's church were conducting their own investigation into the disappearance. A search of Larsen's Danville apartment was conducted and a cigarette butt and a soda can, with cigarette butts in it, were collected and turned over to police the next day.

Following the receipt of this evidence and a note from Larsen's sister stating that "a possible suspect in this case would be Hank Meredith," Detective Downs contacted appellant. Detective Downs interviewed appellant on September 30, 1991, at which time appellant stated that he had not been in Danville and had not seen Larsen since the beginning of the month when she had moved from Richmond to Danville.

On October 2, 1991, Detective Downs returned to Larsen's apartment and retrieved three soda cans and five cigarette butts. The following day police collected the bed sheets, hair and napkins from the trash, and hair from the drain and bathtub, and hairbrushes. Again police were told by Larsen's family members that "there might be some

connection" between Larsen's disappearance and Meredith.

On October 10, 1991, Teresa's body was found rolled up in a carpet on the side of U.S. 127 south of Frankfort, Kentucky. It was badly decomposed and unclothed from the waist down. A black coaxial cable was wrapped around Larsen's throat and right wrist. Underneath the cable were several layers of duct tape. An autopsy determined that the cause of death was ligature strangulation.

Two days after Larsen's body was found, Kentucky State Police Detective, Kenneth Ball, again interviewed appellant who claimed he had never been to Larsen's Danville apartment but had spent the night in her Richmond apartment. Detective Ball collected two cigarette butts from appellant during the interview. Duct tape and paper towels were also removed from appellant's truck pursuant to a consent search.

On January 18, 1992, police re-interviewed appellant who again denied ever being in Larsen's Danville apartment, denied that she was ever in his truck and denied killing her.

On January 22, 1992, the Franklin County Grand Jury indicted appellant for the capital kidnapping, capital murder, and rape of Teresa Larsen. The following day appellant was arrested at Capital Warehouse, the trucking company where he was employed. Pursuant to a search warrant, the company truck that appellant drove was searched and a CB radio and antenna were seized. A second warrant for the search of appellant's personal auto resulted in the seizure of additional radios, antennas, and cables.

As previously noted, the first trial ended with dismissal of the rape charge due to insufficient evidence and the jury hung as to the remaining charges. Appellant was retried September 12, 1994, and convicted on the murder and kidnapping charges.

Appellant makes various assignments of error in this matter of right appeal. Although we have considered all of the issues presented to this Court, to avoid unnecessarily extending this opinion, we will address only those issues that merit discussion. The testimony of the various witnesses and addi-

tional facts will be further developed, as needed throughout this opinion.

For reasons to be stated, we affirm the trial court on the issue of sufficiency of evidence to sustain the kidnapping conviction. On the issues of the improper admission into evidence of the letter written by Paul Childers, the admission of the out-of-court experiment, the improper use of DNA and statistical probability concepts, and on double jeopardy principles, we reverse and remand for a new trial.

## I. EVIDENCE OF KIDNAPPING

■ Appellant's first assignment of error is that there was insufficient evidence to convict for kidnapping, as such, his motion for directed verdict should have been sustained. The indictment charged appellant with capital kidnapping "when he unlawfully restrained Teresa C. Larsen, and his intent was to accomplish or to advance the commission of the a [sic] felony and either kept Teresa C. Larsen in Franklin County or brought Teresa C. Larsen into Franklin County...."

Appellant was found guilty pursuant to an instruction which required the jury to believe beyond a reasonable doubt that he restrained Teresa C. Larsen without her consent with the "intention to accomplish or to advance the commission of the attempted rape of the said Teresa C. Larsen or to inflict bodily injury upon her or to terrorize her...."

It is appellant's position that the court erred in denying his directed verdict motions because there was absolutely no evidence that he unlawfully restrained Larsen with the intent to rape her.

KRS 509.040 states, in part:

Kidnapping.—(1) A person is guilty of kidnapping when he unlawfully restrains another person and when his intent is:

(a) To hold him for ransom or reward; or

(b) To accomplish or to advance the commission of a felony; or

(c) To inflict bodily injury or to terrorize the victim or another; or

(d) To interfere with the performance of a governmental or political function; or

(e) To use him as a shield or hostage.

KRS 500.070 states that the Commonwealth has the burden of proving every element of the case beyond a reasonable doubt. The Commonwealth argues that there was sufficient evidence, albeit circumstantial, that appellant unlawfully restrained Larsen with the intent to commit a felony, or to inflict bodily injury, or terrorize Larsen.

The definition of restrain as defined by KRS 509.010(2) is:

[T]o restrict another person's movements in such a manner as to cause a substantial interference with his liberty by moving him from one place to another or by confining him either in the place where the restriction commences or in a place to which he has been moved without consent. A person is moved or confined "without consent" when the movement or confinement is accomplished by physical force, intimidation, or deception, or by any means....

Larsen's body was found rolled up in a carpet, unclothed from the waist down, with a coaxial cable wrapped around her neck and right wrist. Evidence was introduced to prove that the cable came from appellant's CB radio. There was also evidence that the duct tape, which was also found around Larsen's neck, was possibly used as a gag around her mouth or face and as the result of decomposition had slipped down to her neck.

Appellant contends that the testimony that Larsen was allegedly seen getting into appellant's truck under her own volition proves that she was not restrained. However, under the definition set forth above, it was certainly reasonable for the jury to believe that Larsen initially went with appellant voluntarily and was at some later point in time restrained without her consent. *Stanford v. Commonwealth*, Ky., 793 S.W.2d 112 (1990). We are of the opinion that the evidence was such that it would not have been unreasonable for the jury to believe that appellant restrained Larsen without her consent. *Harris v. Commonwealth*, Ky., 793 S.W.2d 802 (1990).

As to the requirement under KRS 509.040(1)(b) and (c) of intent to commit either a felony or inflict bodily injury or terror-

ize the victim, we also conclude that the evidence supported such a finding. It is utterly incomprehensible that Larsen was bound, possibly gagged and unclothed without any intent on the part of appellant to inflict injury or terrorize her, and we do not believe a jury could have reasonably reached such a conclusion. We affirm on this issue.

## II. CHILDERS' LETTER

■ Appellant also argues that introduction of a letter written to the prosecutor by Paul Childers was inadmissible hearsay evidence because Childers did not testify at trial.

During the second trial Detective Ball testified that he received a letter from the prosecutor written by Paul Childers, a "concerned inmate", which said Pearl Smith had some information about appellant's case. The letter alleged that Smith told Childers that appellant told Smith certain details about the crime. Detective Ball also testified that the letter written by Childers led to his interview of Smith.

During Smith's testimony he denied knowing Childers. The prosecutor asked Smith a series of questions as to what Smith told Detective Ball that appellant had told Smith while in jail. Smith denied making most of the statements to Detective Ball. The prosecutor then asked Smith if Ball "read this to you, 'Yeah I really fucked up when I left that cable where the police could find it.'" Smith acknowledged that Ball had read that to him but he testified that Meredith did not say that. The prosecutor then asked Smith if Ball read a portion of the letter to him that said "Hank had strangled someone with a cord to a radio antenna," and asked Smith if he [Smith] had said that. Smith denied saying that.

Later in the trial Detective Ball was re-called and testified that Smith told him that the information in the Childers' letter was accurate. Anticipating that the Commonwealth would attempt to read the letter to the jury, defense counsel specifically objected to Detective Ball stating the contents of the letter. The trial court made no ruling and the prosecutor continued questioning Ball,

which led to explicit portions of the letter being read to the jury.

Appellant argues that the contents of the Childers' letter, placed before the jury by the prosecutor's questions and Ball's testimony, were pure unadulterated hearsay and denied his rights to confrontation, due process and a fair trial.

On the other hand, the Commonwealth argues that the letter was admissible as a prior inconsistent statement to impeach Smith's credibility. They further argue that the letter was necessary to explain to the jury the reason Detective Ball questioned Pearl Smith about appellant.

In *Jett v. Commonwealth*, Ky., 436 S.W.2d 788 (1969), this Court held that:

> [W]hen both the person who is said to have made the out-of-court statement and the person who says he made it appear as witnesses under oath and subject to cross-examination there is simply no justification for not permitting the jury to hear, as substantive evidence, all they both have to say on the subject and to determine wherein lies the truth.

In this case, unlike in *Jett*, where both the wife, who made the out-of-court statement, and the sheriff, to whom she allegedly made the statement, testified, we only have Pearl Smith testifying. Paul Childers never testified. Under the fact situation and the holding in *Jett*, where both people testified in court, under oath, subject to cross-examination, admission of the contents of the Paul Childers' letter is reversible error.

Appellant relies on *Askew v. Commonwealth*, Ky., 768 S.W.2d 51 (1989), for his conclusion that Smith's statements should not have been admitted because he did not have personal knowledge of appellant's charged offenses. In *Askew*, the Commonwealth questioned a co-participant in a robbery as to what he had told his wife about the appellant's part in the crime. When the co-participant denied making any statements, his wife was then questioned as to what her husband had told her. Finally, when she also denied the statements, the Commonwealth called two police officers who were permitted to play the wife's statement to

them that her husband told her that appellant said he had to kill the victim. *Id.* at 55.

The Commonwealth's belief that the situation in the case at bar was a *Jett, supra,* issue is incorrect. As this Court stated in *Askew, supra,* "the *Jett* rule permits impeachment of a witness who possesses *personal knowledge.*" (emphasis added). If it was the Commonwealth's intention to impeach Pearl Smith, it could have done so with the testimony of Detective Ball alone. Paul Childers had no personal knowledge of the charged offenses and the letter was not necessary to prove what Smith told Detective Ball.

Placing the contents of the Childers' letter before the jury was also improper because it contained an opinion of a witness as to Meredith's guilt. In *Nugent v. Commonwealth,* Ky., 639 S.W.2d 761, 764 (1982), this Court noted the highly prejudicial effect such evidence has on a jury and reiterated such evidence is inadmissible even when it is introduced "through a route which is, at best, 'back door' in nature." Reversal and a new trial are required.

### III. OUT OF COURT EXPERIMENT

■ Appellant argues that the trial court erred in allowing testimony regarding an experiment that was conducted outside the presence of the jury to determine if the evidence was consistent with Larsen having had a gag placed over her face.

Lawrence King, a trace analyst at the KSP Lab, testified that around Larsen's neck were six pieces of duct tape stacked on top of each other, ranging in length from four to nineteen inches, and "on the very bottom of the adhesive side of the duct tape was a brown paper towel which would have been facing toward the victim." The length of the pieces combined was approximately twenty inches. In addition, the coroner's report stated that adjacent to Larsen's face there was fibrous material consistent with duct tape liner.

Subsequently, Kimberly Woolridge, an employee of the Franklin County Commonwealth Attorney's Office, testified that she had participated in an experiment with the prosecutor and King to determine the circumference of her head around the mouth area. Woolridge stated that the circumference of her head at the point of her mouth was nineteen and one half inches. Based upon this experiment, the Commonwealth told the jury in closing argument:

"Kim Woolridge, my paralegal, told you that we had measured her face around the mouth and hers was nineteen and a half inches.... [Y]ou can draw whatever inferences you want to from that, but I think it's clear that that was a gag that was on there at one time and due to the decomposition of the body and the hair and everything coming down, it got below her neck."

The Woolridge testimony and the prosecutor's comments concerning it during closing argument were improper because they were based on materials outside of the record. *Chumbler v. Commonwealth,* Ky., 905 S.W.2d 488 (1995). Given that there was no evidence that the circumference of Larsen's head was ever measured or was even similar to that of Woolridge, the evidence of this out of court experiment was irrelevant and should not have been admitted. We reverse on this issue.

### IV. DNA AND STATISTICAL PROBABILITY CONCEPTS

■ Appellant claims error with the Commonwealth's reference during closing argument to statistical probabilities concerning the DNA match between appellant and the saliva extracted from the cigarettes found in Larsen's apartment.

Barbara Wheeler, a trace evidence analyst at the Kentucky State Police (KSP) lab, testified that two of the butts found in an ashtray in Larsen's apartment, and four of the five butts found in Larsen's garbage can were the same brand as the partial pack of cigarettes taken from appellant upon arrest.

Pat Hankla, a serologist at the KSP lab testified that because such a small amount of saliva can be retrieved from a cigarette butt, and because there is relatively little DNA in saliva, the items had to be sent to a lab "that does a more sensitive DNA method than is currently being performed" at the KSP lab.

Hankla stated that the cigarette butts were sent to Genetic Design, Inc., for PCR testing.

The report of Genetic Design, subsequently introduced into evidence, stated that "[t]he HLA DQ alpha type 1.2, 1.3 obtained from the cigarette butt is consistent with the HLA DQ alpha type obtained from Hank W. Meredith and occurs with a frequency of 2.6% in the North American Caucasian population."

Based on the above mentioned evidence, the prosecutor told the jury in closing argument:

> The cigarette butts, his brand, all over the kitchen and back porch.... [B]ut not only do we have the brand ... we've got his DNA on a cigarette there.... DNA occurs with a frequency of 2.6% in the adult Caucasian population of the United States.... What percentage of that 2.6 smoke these days? ... about a .8? ... what percentage of them smoke Doral full flavor filter kings? I submit to you ... that we're getting that percentage of who that could have possibly been way back.

The Commonwealth's comments lacked an adequate foundation in statistical theory and seem to have come about by virtue of the brand of cigarettes appellant allegedly smoked. Such an argument has been considered and denounced by this Court in *Chumbler v. Commonwealth,* Ky., 905 S.W.2d 488, 494. We hold here, as we did in *Chumbler,* that "[t]he calculations were completely unfounded and in error." *Id.* at 495.

■ The Commonwealth had, at best, a weak circumstantial case. There was no eyewitness to the murder and no physical evidence placing Larson inside appellant's truck. The single cigarette butt that allegedly had appellant's DNA on it did nothing more than place appellant in Larson's Danville apartment at some unknown time. It did not limit appellant's presence to the weekend before her disappearance. Moreover, the charged offenses did not occur in Larson's apartment. This was not harmless error and we reverse on this issue.

## V. *DOUBLE JEOPARDY VIOLATION*

■ Appellant was indicted for capital kidnapping and first degree rape. At the con-clusion of the Commonwealth's proof at appellant's first trial, the court dismissed the rape charge due to lack of evidence.

At appellant's retrial, the court instructed the jury that appellant could be found guilty of kidnapping if he restrained Teresa with the intent "to accomplish the commission of attempted rape ... or to inflict bodily injury upon her or to terrorize her." Appellant argues that the court's instruction was erroneous because it violated double jeopardy principles, and allowed the jury to convict on a theory not charged in the indictment and for which there was no evidence. It is appellant's position that because he was acquitted of rape in the first trial, evidence of that offense could not be used to satisfy an element of the kidnapping charge.

As stated earlier, KRS 509.040 provides, in part, that an individual is guilty of kidnapping if he unlawfully restrains another with the intent to commit a felony, inflict bodily harm, or terrorize the victim. All three of these possibilities were included in the instruction, and while we believe that the evidence was sufficient to support a kidnapping instruction, it was not sufficient to support the kidnapping instruction given by the trial court.

■ The protection against Double Jeopardy is contained in Section 13 of Kentucky's Constitution and it provides "No person shall, for the same offense, be twice put in jeopardy of his life or limb." In *Davis v. Commonwealth,* Ky., 561 S.W.2d 91, 95, (1978), we stated that "[h]aving been acquitted of a crime that was an essential element of the rape charge, [the defendant] could not be tried for rape...." Under familiar principles of law it is improper to use a crime, for which one has been acquitted, to satisfy an element of another crime. In the case at bar, appellant can not be convicted of kidnapping if the rape, for which he had previously been acquitted, is an essential element of that charge.

The Commonwealth's strategy of introducing evidence of a crime for which appellant was previously acquitted clearly violates Double Jeopardy principles. We agree with appellant that the use of the attempted rape

to satisfy the "felony" element of the kidnapping statute was reversible error.

For the reasons stated in parts II, III, IV, and V above this case is reversed and remanded for further proceedings consistent with this opinion.

STEPHENS, C.J., and COOPER, LAMBERT, JOHNSTONE, and STUMBO, JJ., concur on Issues I, II, and V.

STEPHENS, C.J., and COOPER, LAMBERT, and STUMBO, JJ., concur on Issue III.

STEPHENS, C.J., and JOHNSTONE, LAMBERT and STUMBO, JJ., concur on Issue IV.

JOHNSTONE, J., dissents as to Issue III.

COOPER, J., dissents as to Issue IV.

GRAVES, J., dissents by separate dissenting opinion.

WINTERSHEIMER, J., joins in this dissenting opinion.

GRAVES, Justice, dissenting.

Respectfully, I dissent.

Appellant argues that the letter from the "concerned inmate," Paul Childers, was inadmissible hearsay. During Smith's testimony, he admitted that Detective Ball read him portions of the letter during the interview. Smith stated he didn't know whether he told Detective Ball that he might have told Childers what Appellant told him. When Detective Ball was recalled, he stated that the letter was the basis for his interview with Smith. Detective Ball testified that during the interview, Smith stated that the information contained in the letter was accurate. This line of questioning served two purposes. First, it provided an explanation as to why Smith had been questioned about Appellant. Second, it further impeached Smith's testimony. The information was properly received into evidence.

Further, Appellant argues that the kidnapping instruction violated double jeopardy principles because it allowed the jury to find him guilty if he restrained Larsen with the intent to "accomplish or advance the commission of attempted rape ... or to inflict bodily injury upon her or to terrorize her." I do not necessarily condone the Commonwealth's strategy of introducing evidence of a crime for which Appellant was previously acquitted. The instruction clearly should not have included the reference to attempted rape as the felony committed during the kidnapping. However, because the instruction also included the other two circumstances set forth in KRS 509.040(1)(c), any error was harmless. RCr 9.24.

WINTERSHEIMER, J., joins in this dissent.