*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0334p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

    *v.*

ANTHONY E. BALDWIN,

        *Defendant-Appellant.*

No. 04-3199

---

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 03-00720—David A. Katz, District Judge.

Argued: July 8, 2005

Decided and Filed: August 10, 2005

Before: MERRITT, MOORE, and GILMAN, Circuit Judges.

---

## COUNSEL

**ARGUED:** Richard M. Kerger, KERGER & KERGER, Toledo, Ohio, for Appellant. Thomas O. Secor, ASSISTANT UNITED STATES ATTORNEY, Toledo, Ohio, for Appellee. **ON BRIEF:** Richard M. Kerger, KERGER & KERGER, Toledo, Ohio, for Appellant. Thomas O. Secor, ASSISTANT UNITED STATES ATTORNEY, Toledo, Ohio, for Appellee.

---

## OPINION

---

RONALD LEE GILMAN, Circuit Judge. In February of 2003, a grand jury indicted Anthony Baldwin on three counts of wire fraud and on one count of conspiracy to defraud in connection with an attempt to obtain money by faking his own kidnapping. During his jury trial, Baldwin sought to introduce a video reenactment of his conduct during the relevant time period in order to corroborate the account of the kidnapping that he had given to the police. He also moved to suppress testimony by an FBI agent regarding Baldwin's "personality profile." The district court excluded Baldwin's video reenactment, but allowed the FBI agent's testimony. After a one-week trial, the jury convicted Baldwin on all four counts.

Baldwin claims on appeal that the district court committed reversible error as a result of the two evidentiary rulings set forth above. He further argues that his sentence is unconstitutional in light of the Supreme Court's decision in *United States v. Booker*, 125 S. Ct. 738 (2005), which held that the Sentencing Guidelines are no longer mandatory. For the reasons set forth below, we **AFFIRM** Baldwin's conviction, but **REMAND** the case for resentencing in accordance with *Booker*.

1

# I. BACKGROUND

**A.      Factual background**

At the time of the alleged kidnapping, Baldwin's parents owned a family compound in Toledo, Ohio that was adjacent to their restaurant.  Baldwin's residence was in this compound.  In April of 2001, Baldwin's parents received a telephone call from him telling them to go to his residence.  When they arrived, they found a note demanding $350,000 and directing them to "look at one side of the Bed and in the closet."  They found the family dog dead in the bed.  The dog had been stabbed with a knife of the same type as the knives in Baldwin's kitchen.  Baldwin's parents left the family compound and called the police.

FBI Agent Clinton Baber investigated the kidnapping and spoke with Baldwin's father in order to form a personality profile of Anthony Baldwin.  According to Baber, law enforcement officials attempt to form personality profiles of kidnapping victims in order to "determine how the victim will respond . . . to the kidnappers."

The police traced Baldwin's location by tracking calls made from his cell phone and purchases charged to his credit cards.  Two days after the alleged kidnapping, the police spotted Baldwin's car at a gas station in Woodhaven, Michigan.  The engine was running, and two men were sleeping in the front seat. A loaded pistol was found under a blanket in the back seat, and used duct tape, latex gloves, and a blue nylon rope were found on the back floorboard.  The two men were Baldwin and Bianney Rosales, a former employee of the Baldwin family's restaurant.

Baldwin and Rosales were taken to the police station and questioned separately.  In his interview with Baber, Baldwin claimed that Rosales and another man had abducted him from his home.  Baldwin said that the two men bound his hands and feet and put duct tape over his eyes and mouth.  He contended that he heard his dog yelp twice, and that he cried because he believed that it had been killed.  Baldwin said that he was carried out of his home and into his car.  The second abductor purportedly left before the police found Baldwin and Rosales.

During the interview, Baber asked Baldwin to physically demonstrate some of the events that he was recounting.  When Baber asked whether Baldwin had had to urinate in the hours following the abduction, Baldwin responded that he had urinated in the car.  Baber asked Baldwin to demonstrate how he could have unzipped his pants while bound in the manner that Baldwin claimed that he had been at that time.  Although Baldwin attempted to do so, he "never could get his hands anywhere near his zipper," according to Baber.

When Baldwin had finished recounting his version of the kidnapping, Baber said that he found the story implausible and did not think that anyone would believe Baldwin.  The FBI agent accused Baldwin of staging the kidnapping in order to obtain money from Baldwin's own parents.  Baldwin immediately confessed that he had done so, and admitted that he had recruited Rosales to help him.  He also said that he had attempted to mislead the police by creating evidence of a kidnapping, such as the tape residue on his hands and the dead dog.

After the interview, Baldwin asked to see Baber again.  Baldwin inquired whether his parents would find out that Baldwin had killed the dog.  Baber said that this fact would eventually be revealed, so he encouraged Baldwin to tell his parents before trial.  Baldwin then recanted his confession.

As to the police interrogation of Rosales, he initially said that he and another man had kidnapped Baldwin. Rosales later testified, however, that he and Baldwin had staged the kidnapping without any third person being involved.

**B.      Procedural background**

At trial, Baldwin sought to introduce a videotaped reenactment that purportedly demonstrated his ability to unzip his pants with his wrists bound in the manner that he claimed that they had been during the kidnapping. In the videotape, Baldwin's wrists were tied and he was placed in the backseat of a car, as he said he had been when he had to urinate, and he successfully unzipped his pants. The reenactment was filmed through the sunroof of the car.

Although Baldwin's car was a 1993 Lincoln Continental Mark Eight, the car used in the demonstration was the 1997 version of the same automobile. The narrator in the video, Bill Jonke of Bill Jonke and Associates, stated that a 1997 Mark Eight "was the closest that we could find in the City of Toledo for the purposes of this demonstration that we could get access to." Jonke also said that unidentified car dealers had assured him that the car used in the video was "virtually identical in terms of the interior rear seating to the 1993 that Tony [Baldwin] had at the time," but Jonke did not identify the car dealers.

When the district court viewed the video outside the presence of the jury, the government objected to its admission, citing a number of differences between the conditions in the video and the conditions that Baldwin had described during his police interview. Not only was the car used in the video a newer model than Baldwin's car, but the rope was allegedly tied in a different place on Baldwin's wrists and, unlike the rope found in Baldwin's car, there were no knots in the rope used in the video. The front passenger seat was also in a forward position, giving Baldwin more room to maneuver than he would have had if the seat had been in the normal position. Citing these various differences, the court held that "the jury is going to have to rely on his testimony, not a demonstration which isn't taken under the same circumstances."

Baldwin also sought to exclude testimony by Agent Baber about Baldwin's psychological profile. This testimony, which the government claimed was offered to show why Baber did not believe Baldwin's story, included the following:

> When I interviewed Tony's father Jim to learn about the victim in this matter, I learned that Tony Baldwin was a 33-year-old young man who had never cut the financial or emotional umbilical cord from his parents. I learned that, according to his own father, Tony liked a lot of money and wanted a lot of money but didn't want to work. That Tony had one failure after the other after the other relative to business, jobs. He had never been successful in any of his jobs, and that he had had financial setbacks up to and including when the leased vehicle that he'd had was—he didn't or couldn't make the payments on it; mom and dad took it and began to make the payments on it, and then gave Tony the family Lincoln. That Tony lived in a home for—lived in the home given to him by his parents. And then in addition to giving him the home, they paid half the taxes and half the utilities for him. And that Tony had a tendency to withdraw when he was depressed. Wasn't close to anyone, was a loner, and that Tony's greatest accomplishment had been obtaining his GED.
>
> When he struck out on his own to try to establish businesses, one in California and one in Florida, he failed within a few weeks of those and came back home. But that according to Tony's father, an exact quote was, "Tony liked to work from 10:00 A.M. to 2:00 P.M., make a lot of money, and not work very hard."

The court allowed Baber's testimony on the ground that "[i]t's not for the truth of the matter."

Baldwin was convicted on three counts of wire fraud, in violation of 18 U.S.C. §1343, and on one count of conspiracy to defraud, in violation of 18 U.S.C. §371. The district court then sentenced him to 55 months of imprisonment on each count, to run concurrently. This timely appeal followed.

## II. ANALYSIS

### A.     Standard of review

We will reverse a district court's decision to admit or exclude evidence only if we find that the district court has abused its discretion, and only if we are "firmly convinced of a mistake that affects substantial rights and amounts to more than harmless error." *Pressman v. Franklin Nat'l Bank*, 384 F.3d 182, 187 (6th Cir. 2004) (citation and quotation marks omitted). An abuse of discretion occurs when the district court "relies on clearly erroneous findings of fact, . . . improperly applies the law, or . . . employs an erroneous legal standard." *United States v. Cline*, 362 F.3d 343, 348 (6th Cir. 2004).

### B.     Exclusion of the videotaped reenactment

The video reenactment, made for the purpose of demonstrating that Baldwin was physically capable of unzipping his pants while allegedly bound in his car, is a form of experimental evidence. This circuit has held that "[e]xperimental evidence is admissible so long as the evidence is relevant and probative, and experimental evidence is deemed to have probative value if the conditions of the experiment were identical with or similar to the conditions of the transaction in litigation." *Crown Cork & Seal Co. v. Morton Pharm., Inc.*, 417 F.2d 921, 926 (6th Cir. 1969). The conditions of the experiment must be "substantially similar" to those of the event at issue, but "[a]dmissibility . . . does not depend on perfect identity between actual and experimental conditions." *Persian Galleries, Inc. v. Transcon. Ins. Co.*, 38 F.3d 253, 258 (6th Cir. 1994) (citation and quotation marks omitted). Where the conditions are substantially similar, "dissimilarities affect the weight of the evidence, not its admissibility." *Id*. (citation and quotation marks omitted).

In *Persian Galleries*, this court considered the government's proffer of a video reenactment of a robbery. The purpose of the video was "to demonstrate that the theft of the [stolen merchandise] could have been completed within the time interval that elapsed between the activation of the alarm system and the arrival of the first officer." *Id*. In objecting to the proffer, the defendant's primary argument was that the reenactment used tape to secure the remaining glass in the door frame, whereas the defendant claimed that the glass fragments could have otherwise fallen out and slowed down the robbery. This court upheld the admissibility of the evidence, however, "[b]ecause the videotaped experiment was substantially similar to the actual conditions at the burglary scene." *Id*.

The video in the present case, in contrast, is less similar to the events that it purports to reenact. Unlike the video in *Persian Galleries*, which was shot at the scene of the crime, the video in question was not shot in Baldwin's car. Baldwin's video differs from the circumstances of the alleged kidnapping in other ways as well and, unlike the taped glass in *Persian Galleries*, these differences were more likely to affect the result of the experiment. For example, whether the rope was knotted or unknotted would have an obvious effect on the ease with which Baldwin could move his hands when bound with the rope. Likewise, whether the front seat was bent forward or not would directly affect the amount of space that Baldwin had to move around in.

But Baldwin presents one additional argument for the admission of the video—that the evidence is "'more probative on the point for which it [was] offered than any other evidence' [that Baldwin] could procure." *United States v. Toney*, 599 F.2d 787, 790 (6th Cir. 1979) (holding that the district court committed reversible error in excluding statements corroborating the defendant's story) (citation and quotation marks omitted). This argument, however, fails to take into account the ways that the conditions in the video could have matched more closely those of the alleged kidnapping, and therefore been more probative. First, Baldwin could presumably have used his own car, rather than selling it after the crime. Second, he could have used a knotted rope, like the one with which he was allegedly bound. A third way to make the video more probative would have been to put the front seat in the same position that it was in during the alleged kidnapping. Because Baldwin could have produced a video that more closely replicated

the conditions that he described to Agent Baber, we conclude that the excluded video was not "more probative . . . than any other evidence [that Baldwin] could procure." *Toney*, 599 F.2d at 790.

In sum, we conclude that the district court did not abuse its discretion in excluding the video. We acknowledge, however, that the video is not so far removed from reality that we would have found an abuse of discretion had the district court reached the opposite result and admitted the evidence. *See Tompkin v. Philip Morris USA, Inc.*, 362 F.3d 882, 897 (6th Cir. 2004) ("Broad discretion is given to district courts in determinations of admissibility . . . and those decisions will not be lightly overturned.") (citation and quotation marks omitted).

## C.      Admission of Agent Baber's testimony

### 1.      *Admissibility*

Whether profile evidence is admissible depends upon the purpose for which it is introduced. Federal Rule of Evidence 404(a) states that "[e]vidence of a person's character . . . is not admissible for the purpose of proving action in conformity therewith on a particular occasion," unless the evidence involves "a pertinent trait of character of the alleged victim of the crime [and is] offered by the accused" or involves the "a pertinent trait of character" of the accused himself. The latter form of evidence must be "offered by an accused, or by the prosecution to rebut the same." *Id*. In keeping with this rule, "[c]ourts have condemned the use of profiles as substantive evidence of guilt." *United States v. Long*, 328 F.3d 655, 666 (D.C. Cir. 2003) (citation omitted).

Profile evidence is properly admissible, however, when it is introduced "to demonstrate why the defendant was stopped for investigation, to rebut inferences raised by the defendant's testimony, or to show modus operandi." *United States v. Ward*, Nos. 96-5731 / 5892, 1998 WL 45491, at *5 (6th Cir. Jan. 27, 1998) (unpublished) (citations omitted); *see also United States v. Sokolow*, 490 U.S. 1, 10 (1989) (upholding the constitutionality of a search and noting that "the fact that [the factors used to establish reasonable suspicion] may be set forth in a 'profile' does not . . . detract from their evidentiary significance as seen by a trained agent"); *United States v. Valme*, No. 98-1340, 1999 WL 519232, at **6-7 (6th Cir. July 16, 1999) (unpublished) (holding that evidence that the defendant fit a "drug courier profile" was admissible because it "was offered only to explain why the authorities pursued the vehicle driven by [the defendant]").

The government argues in its brief that Agent Baber's testimony was offered "to show why Baber focused on Baldwin as a suspect and not victim . . . [and] to explain why Baber conducted the interview of Baldwin in the manner he did." This rationale was apparently accepted by the district court. If Baber's focus on Baldwin as a suspect or his interview technique had been at issue, Baber's testimony would presumably have been admissible. *See Valme*, 1999 WL 519232, at **6-7. No such issues, however, were ever raised. The personality profile also had nothing to do with the *modus operandi* of the staged kidnapping, so it could not have been relevant in that respect. Because neither Baber's state of mind nor his interrogation technique had been raised as an issue by the defense, his testimony about Baldwin's personality profile was irrelevant. The district court therefore erred in admitting it. *See* Fed. R. Evid. 404(a).

### 2.      *Harmless error analysis*

Even where a district court erroneously admits evidence, we will not reverse the defendant's conviction if the error is deemed harmless. *Rodriguez v. Renico*, No. 02-2327, 2004 WL 771954, at *1 (6th Cir. 2004) (unpublished) (upholding the defendant's conviction despite the introduction of profile evidence because "[t]here was substantial evidence in the record apart from the profile evidence which established the petitioner's guilt") (quotation marks omitted) (alteration in original); *see also United States v. Rogers*, 118 F.3d 466, 478-79 (6th Cir. 1997) (holding that "the district court probably erred by admitting" certain recorded conversations, but declining to reverse because "any error was harmless"). An error is harmless

"when it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Mitchell v. Esparza*, 540 U.S. 12, 17-18 (2003) (citation and quotation marks omitted).

In the present case, there was overwhelming evidence of guilt beyond the erroneously admitted testimony. After Baber pointed out the implausibility of his initial story, Baldwin confessed to the crime. Baldwin recanted his confession only after he realized that his parents would find out that Baldwin had killed his own dog. Rosales also testified that Baldwin recruited him for a "fake kidnapping," and that he went along with Baldwin's plan. The combination of Baldwin's original confession, the testimony of his coconspirator, and the implausibility of Baldwin's initial story establish "that the error complained of did not contribute to the verdict obtained." *Mitchell*, 540 U.S. at 17-18. We therefore conclude that the district court's error in admitting the personality profile testimony was harmless under the circumstances of this case.

## D.    *Booker* **issue**

Baldwin's final argument—that his sentence is unconstitutional in light of the Supreme Court's recent determination that the Sentencing Guidelines are no longer mandatory—is more persuasive. *See United States v. Booker*, 125 S. Ct. 738, 769 (2005) (holding that the portion of the Sentencing Act requiring judges to sentence defendants in accordance with the Sentencing Guidelines is unconstitutional); *United States v. Barnett*, 398 F.3d 516, 529 (6th Cir. 2005) ("Instead of speculating as to the district court's intentions in the pre-*Booker* world, and trying to apply those intentions to predict the same court's sentence under the post-*Booker* scheme, we are convinced that the most prudent course of action in this case is to presume prejudice given the distinct possibility that the district court would have imposed a lower sentence under the new post-*Booker* framework and [given] the onerous burden he would face in attempting to establish that the sentencing court would have imposed such a sentence.").

As this court noted in *United States v. Oliver*, 397 F.3d 369 (6th Cir. 2005), "even if we conclude that the evidence [upon which the judge based his sentencing determination] is overwhelming and essentially uncontroverted[,] we cannot know the length of imprisonment that the district court judge would have imposed pursuant to this evidence following *Booker*." *Id*. at 380 n.3 (citation and quotation marks omitted). In the present case, Baldwin was sentenced to 55 months of imprisonment, which is in the lower half of the Sentencing Guidelines range of 51 to 63 months. The government presented no evidence to rebut the presumption that this sentence was prejudicial to Baldwin. *See Barnett*, 398 F.3d at 529. We therefore hold that the district court committed plain error in sentencing Baldwin under the then-mandatory Sentencing Guidelines.

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** Baldwin's conviction, but **REMAND** the case for resentencing in accordance with *Booker*.