**Roy RANKIN, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 2009–SC–000385–MR.

Supreme Court of Kentucky.

Dec. 16, 2010.

---

Erin Hoffman Yang, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General, Christian Kenneth Ray Miller, Assistant Attorney General, Office of Attorney General, Office of Criminal Appeals, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice ABRAMSON.

Roy Rankin appeals as a matter of right from a Judgment of the Fayette Circuit Court convicting him of first-degree criminal abuse, in violation of Kentucky Revised Statute (KRS) 508.100, and of wanton murder, in violation of KRS 507.020(1)(b). In accord with the jury's recommendation, the Judgment orders Rankin to serve concurrent prison sentences of ten and twenty years, respectively. The Commonwealth alleged, and the jury found, that Rankin abused and wantonly caused the death of his girlfriend's six-month-old daughter, C.A. Rankin maintains that his trial was rendered unfair by either of two trial court errors: first, the court's refusal to strike for cause a potential juror who had been subjected to sexual abuse as a child, and second, the court's admission into evidence of a social worker's video-recorded experiment involving C.A.'s two-year-old brother, M.A. Rankin also maintains that because evidence of his mental retardation compels a finding that he was incapable of acting

wantonly, the trial court should have *sua sponte* directed a verdict on the wanton murder charge. Finding no reversible error, we affirm.

### RELEVANT FACTS

The evidence at trial showed that Rankin became acquainted with C.A.'s mother, Samantha Monahan,[1] in April or May 2005. Rankin was living on Perry Street in Lexington with his twin brother in a home next door to his parents and two doors from his sister. When she met Rankin, Monahan and her two young children were living with her mother in Tennessee. Weekend visits led, in early July 2005, to Monahan's moving in with Rankin and his family at Rankin's home in Lexington. In mid-August, Monahan began working an evening shift at a convenience store, and on the evenings she worked, according to Rankin's mother, Rankin would bring the children to his parents' house and watch them there. He was watching them there on the evening of August 22, 2005, when, shortly before 7:00, he carried C.A. to the front porch, where his parents were sitting, and asked for help because C.A. was not breathing. The parents in turn summoned help from their daughter next door. The daughter called 911, and while the family waited for the ambulance, the operator told the daughter's husband how to perform CPR. Emergency room personnel at the University of Kentucky Medical Center also attempted to resuscitate C.A., but all efforts to revive her failed, and C.A. was pronounced dead about forty minutes after her arrival at the hospital.

In the days immediately following C.A.'s death, police investigators interviewed Rankin a couple of times. He told them that Monahan's shift at work usually began at 2:00 pm, but that car problems had delayed her that day. Nevertheless, by 3:00 Monahan had gone to work, and Rankin had situated the children in a back room at his parents' house. There, he claimed, he watched the children steadily for several hours, but sometime after 6:00 he put the children down for a nap, leaving C.A. in her car seat on the floor. He left them unattended briefly while he helped move a television and ate dinner, and when he checked in on them before 7:00 he found the car seat tipped over and C.A. on the floor with M.A. kneeling on her neck. According to Rankin, C.A.'s body was limp when he picked her up, and that was when he sought help from his parents.

The investigators also interviewed Rankin's father, who told them that Rankin had brought the children over to his, the elder Rankin's, house around 1:00 pm and had watched them until dinner time. Rankin had eaten some food and had helped move a television, and it was shortly after the elder Rankin had finished eating and gone out to sit on the porch that his son had asked for help with C.A.

The autopsy and subsequent studies of C.A.'s head, torso, and extremities revealed numerous rib and appendicular fractures. Some of those injuries occurred near the time of death while others showed various stages of healing. The timing and sequence of the earlier injuries could not be precisely determined, but one expert estimated that they probably occurred between two to twelve weeks prior to C.A.'s death. The medical examiner testified that the immediate cause of C.A.'s death was a blunt force trauma to her head, an impact that fractured her skull and injured her brain. According to the medical examiner, the head injury would have been symptomatic immediately, causing unconsciousness, seizures, or respiratory arrest,

**1.** The Commonwealth informs us that in her pleadings before the Court of Appeals, C.A.'s mother refers to herself as Samantha Monahan Acosta. Because "Monahan" is the name used in the indictment and throughout the trial, we refer to her as "Monahan".

and in her opinion death probably ensued in about thirty minutes, although C.A. could possibly have lived for as long as five hours.

The grand jury indicted both Rankin and Monahan for criminally abusing C.A. and Rankin for murdering her. The pair was jointly tried, and both were convicted.[2] Rankin's defense was that his low intelligence made him an unwitting witness of abuse perpetrated solely by Monahan. With respect to C.A.'s death, Rankin argued that although C.A. had died on "his watch," the injury had been inflicted earlier by someone else. In support of that claim, he noted the medical examiner's testimony that C.A. could have survived the blow to her head for as long as five hours and presented other expert medical testimony to the effect that C.A. could have survived for as long as five days. He also presented testimony by family members to the effect that Monahan had been later going to work on the day of C.A.'s death— 3:30 or 4:00—rather than the 1:00–3:00 range that Rankin and his father had initially told investigators.

As noted, the jury rejected Rankin's defense, and now on appeal Rankin first contends that he was denied the full use of his peremptory strikes, and hence was denied a fair trial, when he was obliged to use a peremptory to remove a prospective juror who should have been removed for cause. We begin our analysis with this claim of error.

### ANALYSIS

### I. The Trial Court Did Not Abuse Its Discretion By Refusing To Strike Juror 462.

██ As Rankin correctly observes, under the Sixth and Fourteenth Amendments to the United States Constitution and Section 11 of the Kentucky Constitution, a criminal defendant is entitled to an impartial jury. To help protect that right, RCr 9.36 mandates that "[w]hen there is reasonable ground to believe that a prospective juror cannot render a fair and impartial verdict on the evidence, that juror shall be excused as not qualified." In making this determination, the trial court is to consider the prospective juror's voir dire responses as well as his or her demeanor during the course of voir dire, and is to keep in mind that generally it is the totality of those circumstances and not the response to any single question that reveals impartiality or the lack of it. *Shane v. Commonwealth*, 243 S.W.3d 336 (Ky. 2007).

██ Reasonable grounds to excuse a prospective juror exist whenever the juror expresses or shows an inability or unwillingness to act with entire impartiality. In *Shane*, for example, we held that a prospective juror who worked as police officer and who stated during voir dire that he was absolutely pro-police and that he believed police officers were less likely to lie under oath than most other people because they took the oath more seriously should have been excused notwithstanding his assurances that he could serve impartially.

 Reasonable grounds to excuse a prospective juror may also exist where the prospective juror's relationship with some aspect of the litigation, "be it familial, financial or situational, with any of the parties, counsel, victims or witnesses," is such that it is highly unlikely that the average person could remain impartial under the

**2.** Monahan was convicted of first-degree criminal abuse and sentenced to prison for ten years.

circumstances. *Marsch v. Commonwealth,* 743 S.W.2d 830, 833 (Ky.1988) (citation and internal quotation marks omitted). We have held, for example, that a prospective juror with an ongoing relationship with counsel should have been excused, as should a prospective juror whose brother was to be an important witness. *Ratliff v. Commonwealth,* 194 S.W.3d 258 (Ky.2006) (collecting examples of implied bias). Although we review the trial court's rulings on motions to strike for abuse of discretion, *Adkins, v. Commonwealth,* 96 S.W.3d 779 (Ky.2003), substantial doubts about a prospective juror's impartiality should be decided against the juror, and where such doubts are patent on the record we will not hesitate to find that discretion has been abused. *Shane, supra.*

Rankin contends that the trial court abused its discretion by refusing to strike Juror 462. During voir dire, the Commonwealth asked the members of the panel if they or a loved one had ever been abused by a parent or other care provider. When invited to the bench, Juror 462 stated that she was a victim of sexual abuse and rape during her childhood. The questioning proceeded as follows:

> Juror: I don't know what this case involves.
>
> Commonwealth: The question was very broad like that. How old were you when this happened? [pause] Was it over a period of time?
>
> Juror: Yes.
>
> Commonwealth: Were you less than twelve?
>
> Juror: Yes.
>
> Commonwealth: O.K. There are no allegations of sexual abuse or rape in this case. This is a physical abuse case. However, our experiences affect the way that we approach these kinds of things. Do you think you could set aside what has happened to you and base a decision on the evidence in this case?
>
> Juror: Yes.
>
> Commonwealth: This case, much like what happened to you, is a very emotional, could be a very emotional thing. Do you feel like you'll be able to set the emotion aside, and listen to the evidence and base your decision on evidence, not on emotion?
>
> Juror: I think it would be hard, but I think I can.

Rankin maintains that as a victim of abuse at the hands of a loved one, Juror 462 was likely to sympathize unduly with C.A. and for that reason to be biased in favor of the prosecution. However, "the mere fact that a prospective juror has been the victim of a crime similar to the crime being tried does not by itself imply a disqualifying bias. Additional evidence of bias is required." *Brown v. Commonwealth,* 313 S.W.3d 577, 598 (Ky.2010). Rankin asserts that additional evidence here came from Juror 462's emotional demeanor during her questioning and from her uncertain response—"I think I can."— to the question about whether she could put that emotion aside. We agree with the Commonwealth, however, that the record does not bear out those characterizations. On review of the video recording, Juror 462's demeanor was not unduly emotional, and her responses were positive rather than uncertain, emphasizing the "I can" rather than the "I think." Nor were the circumstances such as to make it highly likely that an average person would be biased. Although Juror 462's childhood experience was doubtlessly very traumatic, many years had passed since then, Juror 462 had apparently come to terms with the trauma, and she indicated an ability to consider Rankin's case dispassionately. Moreover, as the trial court noted, this case involved physical abuse of a six-month

old but no evidence of any form of sexual abuse. On the record before us, therefore, it cannot be said that the trial court abused its discretion by refusing to excuse Juror 462.[3]

## II. The Trial Court Did Not Abuse Its Discretion By Admitting Into Evidence The Video Recording Of An Out–Of–Court Experiment.

██ Rankin next contends that his trial was rendered unfair when the Commonwealth was permitted to play for the jury a social worker's video recording of M.A., C.A.'s two-year-old brother, interacting with a sand-filled teddy bear weighted to approximate C.A.'s weight and placed in a car seat like C.A.'s on the floor of the social worker's interview room. The recording was prepared in response to Rankin's police statement, in which he claimed that he found C.A. spilled from her car seat with M.A. kneeling on her neck. Rankin asserts, and our review confirms, that the recording shows M.A. trying and failing to lift the weighted teddy bear from the seat. Rankin maintains that this exhibit was prejudicially misleading, because, although weighted to be like C.A., the teddy bear was different from the infant in other respects and thus did not provide a reliable comparison. We agree with the Commonwealth, however, that the limitations of this experiment went to its weight as evidence, not its admissibility.

As Professor Lawson notes, our rules of evidence do not address out-of-court experiments specifically, but leave the admissibility of such evidence to the general rules of relevance. Robert C. Lawson, *The Kentucky Evidence Law Handbook,*

§ 11.15(3) (4th ed.2003). Relevant evidence is generally admissible, of course, unless its probative value is substantially outweighed by its unduly prejudicial effect. Kentucky Rule of Evidence (KRE) 402; KRE 403. We have not had much occasion to apply those rules to experiments, *see Meredith v. Commonwealth,* 959 S.W.2d 87 (Ky.1997) (deeming an experiment irrelevant where no attempt was made to establish any similarity between the conditions of the experiment and the facts of the case being tried), but, as Professor Lawson also notes, the federal courts, applying rules much like ours, have held that experiment evidence is generally admissible if it bears upon a material issue and if the proponent establishes a sufficient similarity between the conditions of the experiment and those of the event in question. *United States v. Williams,* 461 F.3d 441 (4th Cir.2006); *United States v. Baldwin,* 418 F.3d 575 (6th Cir.2005); *United States v. Gaskell,* 985 F.2d 1056 (11th Cir.1993); *Four Corners Helicopters, Inc. v. Turbomeca, S.A.,* 979 F.2d 1434 (10th Cir.1992).

██ What counts as "sufficient" similarity depends on the purpose for which the evidence is being offered. If the experiment is offered as a simulation of actual events, then there must be a substantial similarity between the experimental conditions and those which are the subject of the litigation. *Id.* If, on the other hand, the experiment is not meant to simulate what happened, but rather to demonstrate some general principle bearing on what could or what was likely to have happened, then the similarity between the experimental and the actual conditions need not be as

3. This conclusion makes it unnecessary to address whether *Gabbard v. Commonwealth,* 297 S.W.3d 844 (Ky.2009), which clarifies the manner in which juror selection errors are to be preserved, applied retrospectively to Rankin's trial. We note that that precise issue was raised in *Paulley v. Commonwealth,* 323 S.W.3d 715 (Ky.2010), and this Court held *Gabbard* would not apply retroactively.

strong. *Turbomeca, supra; Gilbert v. Cosco Incorporated,* 989 F.2d 399 (10th Cir.1993). In either case, however, the similarities must be such as to afford a fair comparison, and the court should be mindful of the significant risk of undue prejudice inherent in dramatic presentations offered to the jury as reenactments of the events being litigated. *Gaskell, supra; Turbomeca, supra.* If the experiment evidence is sufficiently similar to be probative and if its probative value is not outweighed by undue prejudice, then differences between the experiment and the event at issue go to the weight of the evidence, not its admissibility. *Turbomeca, supra.*

■ These federal cases offer sound guidance, we believe, for the application of our rules. As with other types of evidence, the admissibility of experiment evidence is discretionary; the trial court's ruling will be disturbed on appeal only if that discretion is abused. *Cecil v. Commonwealth,* 297 S.W.3d 12, 20 (Ky.2009) (citing *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky.1999)).

Here, the Commonwealth did not offer the social worker's video of M.A. as a simulation of what happened to C.A., but rather as proof tending to show that the two-year-old was not strong enough to lift his fourteen-pound sister out of her car seat, thus casting doubt on Rankin's statement to police that he found the children on the floor with M.A. kneeling on C.A.'s neck. For this limited purpose, the weighted teddy bear was sufficiently like an infant to give the experiment some probative value, and since the experiment was not offered to the jury as an image of what happened, it posed little risk of undue prejudice. Although there are certainly differences between a sand-weighted teddy bear and an infant, those differences are not likely to make the infant easier to lift. Further, Rankin was free to argue,

and did argue, that M.A. could have tried harder to lift C.A. than he did the teddy bear or that he need not have lifted C.A. at all, but could have overturned her car seat by climbing on it or tipping it over. In short, the experiment's obvious limitations can reasonably be deemed to go to its weight as evidence, not to its admissibility. The trial court did not abuse its discretion, therefore, by admitting the social worker's video recording.

### III. There Was Sufficient Evidence That Rankin Acted Wantonly.

■ Finally, Rankin contends that he is entitled to relief from his conviction for wanton murder because the evidence failed to establish that he is capable of acting wantonly, *i.e.,* that he could perceive and disregard a certain risk, in this case a grave risk of death. He maintains that his mild mental retardation, which, according to expert testimony, limits his ability to reason and to appreciate the relationship between cause and effect, compels a finding that, whatever he may have done to C.A., he did not realize that it posed a risk of killing her. Rankin concedes that this issue was not preserved by timely motions for a directed verdict, but he asserts that insufficient evidence claims may be raised at any time. We need not address the preservation issue or the standard of review applicable to unpreserved directed verdict claims, because even under the *Benham* standard, the standard of review for preserved directed verdict claims, Rankin is not entitled to relief. *But see Potts v. Commonwealth,* 172 S.W.3d 345 (Ky. 2005) (holding that unpreserved directed verdict claims are to be reviewed under the palpable error standard and that failures of proof do not necessarily meet that standard).

■ Under *Commonwealth v. Benham,* 816 S.W.2d 186 (Ky.1991), where a

motion for directed verdict has been denied, the question on appeal is whether, after viewing the evidence in the light most favorable to the Commonwealth, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. 816 S.W.2d at 187. As Rankin notes, to convict a defendant of wanton murder, the Commonwealth must prove, among other things, that the defendant engaged in conduct creating a grave risk of death and that he perceived that risk but disregarded it. KRS 507.020(1)(b); KRS 501.020(3). Rankin does not claim that he lacked the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. KRS 504.020. The experts who examined him all agreed that he was competent in that sense. Rankin does not dispute, furthermore, that the evidence establishing his access to C.A. and the Commonwealth's medical proof concerning how and when C.A. died permit an inference that Rankin subjected C.A.'s head to a blow forceful enough to fracture her skull and to cause a fatal injury to her brain. Nor does he dispute either that severe blows to the head, particularly to a baby's head, are so frequently fatal as to pose a grave risk of death, or that a person of normal intelligence would know that and so would perceive the risk. He claims that his mild retardation invalidated that last inference in his case and that otherwise there was no evidence that he recognized the fatal risk posed by blows to the head. We disagree.

Rankin's experts did not testify that he was incapable of perceiving a grave risk of death, but rather that in some circumstances he would be less capable of doing so than a person of normal intelligence. He was capable, they testified, of appreciating the connection between a blow he saw and the resulting bruise, but might be less able than others to imagine potential causes of a bruise the cause of which he had not witnessed. Other evidence tended to show that Rankin's ability to perceive risks was not so limited that he would fail to recognize the potentially dire consequences of a severe blow to an infant's head. First, one of the officers who interviewed Rankin testified that Rankin requested that the interview be recorded. It could fairly be inferred from that request that Rankin perceived the rather abstract risk to himself posed by the law and its officers. More tellingly, in one of Rankin's police interviews he told the officer that when he was going to leave C.A. on a bed, he would place pillows on the floor around it to protect her in case she fell. A juror could reasonably infer from these pieces of evidence that notwithstanding Rankin's limitations, he understood that actions could have injurious consequences, and in particular that blunt force impacts could be injurious to a baby. It would not be unreasonable to infer further that Rankin would also understand that the more severe the impact the more serious the potential injury and that very severe impacts posed a grave risk of death. The evidence of wantonness, in other words, was sufficient, and thus even had this issue been preserved Rankin would not be entitled to relief.

### CONCLUSION

In sum, Rankin received a fair trial and his guilt was sufficiently proven. Although prospective Juror 462 had been the victim of sexual abuse as a child, her experience was remote enough to make credible her confident assertions that she could assess the evidence in this physical abuse and homicide case dispassionately. Video evidence that C.A.'s two-year-old brother was not able to lift a weighted teddy bear from a car seat was sufficiently probative to be admissible. It tended to refute Rankin's

statement to police that M.A. had injured the child and, by thus calling that statement's veracity into question, to support the inference that Rankin's consciousness of guilt caused him to fabricate claims against two-year old M.A. The video experiment's limitations were obvious and not apt to confuse or mislead the jury, and so were properly deemed to affect the weight of the evidence rather than to preclude its admission. Finally, evidence that Rankin is mildly retarded and perhaps less able than a person of normal intelligence to perceive all of the potential consequences of a particular act did not preclude the jury's finding that he acted wantonly. Sufficient evidence tended to show that Rankin could anticipate a physical act's immediate consequences, and more particularly that he could understand the risk of death posed by severely striking an infant's head. Rankin is thus not entitled to relief, and accordingly we affirm the June 11, 2009 Judgment of the Fayette Circuit Court.

MINTON, C.J.; CUNNINGHAM, NOBLE, SCOTT, and VENTERS, JJ., concur. SCHRODER, J., concurs in result only by separate opinion.

SCHRODER, J., Concurring in Result Only:

I concur in result only because I disagree with the majority's conclusion that the video recording was admissible as "experiment evidence" pursuant to the cases cited, and, in any event, I believe the video recording should have been excluded under KRE 403. However, in light of the overwhelming evidence of injuries to C.A., I would hold the error harmless and affirm.