RENDERED: JUNE 13, 2024
TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0305-MR

DAQUAN N. LAMPKINS                                                  APPELLANT

V.

ON APPEAL FROM JEFFERSON CIRCUIT COURT
HONORABLE JULIE KAELIN, JUDGE
NO. 18-CR-002490

COMMONWEALTH OF KENTUCKY                                  APPELLEE

**OPINION OF THE COURT BY JUSTICE NICKELL**

**<u>AFFIRMING</u>**

Daquan N. Lampkins was convicted by a Jefferson County jury of two counts of murder, possession of a handgun by a convicted felon, and violation of protective order. He received a sentence of life imprisonment without the possibility of parole and appeals to this Court as a matter of right.[1] Lampkins argues the trial court erred by: (1) excluding the victims' toxicology reports; (2) failing to instruct the jury to accept a judicially noticed fact; (3) failing to strike two jurors for cause; (4) improperly admitting evidence of prior bad acts; and (5) permitting the Commonwealth to dramatize one of the murders. Discerning no reversible error, we affirm.

---

[1] KY. CONST. § 110(2)(b).

**FACTS AND PROCEDURAL HISTORY**

Lampkins was involved in a tumultuous "on-again, off-again" relationship with Delivia Carron. They met sometime in late 2014 or early 2015. Lampkins and Carron briefly lived together in 2015, but she moved out and eventually got her own apartment in a complex located in the South End of Louisville, Kentucky.

On May 29, 2016, Carron called 911 to report that Lampkins had assaulted her. Lampkins was arrested and charged with fourth-degree assault. Carron subsequently reconciled with Lampkins, but a pattern of abuse continued.

On February 8, 2017, Lampkins and Carron began to argue while Lampkins was driving. Carron was sitting in the front passenger seat. Her friend, Tahaza Shaw, was sitting in the back seat with Carron's infant son. As the argument escalated, Lampkins began to punch Carron repeatedly in the face while the car was still in motion. He stopped the car in the middle of the road and continued beating Carron who began to bleed. Realizing she could not help Carron, Shaw took the child and exited the vehicle. Lampkins proceeded to drag Carron out of the car by her hair. He kept hitting Carron in the street. After Lampkins completed the assault, he took her cellphone and keys and drove away leaving the three of them stranded on the road.

Following this incident, Carron did not feel safe to return home because Lampkins had taken her keys. She went to stay with a friend in Indiana. While Carron was in Indiana, her close friend and neighbor, Shanisha Jackson,

2

arranged for the locks to be changed at her apartment. Eventually, Carron returned home and began dating a man named Ricky Jones around this same time.

On April 9, 2017, Carron sought and obtained an emergency protective order (EPO) against Lampkins. The EPO was served on him the same day. Lampkins continued to maintain contact with Carron in violation of the EPO. The next day, Lampkins communicated with Jones on social media purportedly seeking advice on the situation with Carron.

On April 12, 2017, Lampkins brought Carron gifts to celebrate her twentieth birthday and they went to the Louisville Waterfront Park along with Carron's son and Jackson. Jackson testified she was angry at Carron for spending time with Lampkins after the issuance of the EPO and accompanied them as a chaperone. After the outing, Lampkins spent the night at Carron's apartment.

Lampkins left Carron's residence the next morning. At some point, Lampkins called and asked Carron if he could see her again that evening. She refused and instructed him not to return to her apartment because she was expecting a visit from Jones.

In response, Lampkins redoubled his efforts to contact Carron. He called her relentlessly.[2] At 9:21 p.m. on April 13, 2017, she told Lampkins to stop

---

[2] Between April 12 and 14, 2017, Lampkins called Carron 46 times with the last call occurring at 12:52 a.m. Because Carron had blocked his number, Lampkins often called using private numbers. He did not make any additional calls to Carron after the murders took place.

calling her. After his calls remained unanswered, Lampkins went to Carron's apartment.

When Lampkins reached Carron's apartment, Jones opened the front door. Lampkins fired two shots at Jones from close range. One shot grazed Jones's thigh and the other struck him in the back, piercing his left lung and spleen. Carron fled out the backdoor toward Jackson's apartment where she had often sought refuge from Lampkins's abuse in the past. Lampkins caught up with Carron as she reached the stairs to the landing outside Jackson's apartment. Lampkins shot her thirteen times, with seven of those striking her in the back. As the gunshots rang out, Carron pounded on Jackson's door screaming for help. Upon hearing the gunfire and screaming, Jackson called 911, but she did not see anyone outside and did not open her door until the police arrived.

Police promptly responded and immediately discovered Carron's wounded body. Noticing the police presence, Jackson came outside and became distraught when she saw Carron lying at her door. She cried out that "[Carron's] boyfriend did this."

Carron was pronounced dead at the scene by EMS personnel. Jackson informed the police officers that Carron lived nearby with her infant child. Officers hastened to Carron's apartment where they found Jones who was pronounced dead at the scene. Carron's child was recovered unharmed from the bedroom.

4

Police collected evidence at the scene and canvassed the apartment complex, but little direct evidence tied Lampkins to the murders. The murder weapon was never recovered and there were no eyewitnesses. A DNA sample matching "John Smith"[3], an alleged local drug dealer, was eventually obtained from a Swisher Sweets cigar wrapper recovered from the parking lot behind Carron's apartment on the night of the murders. However, the police did not make any connection between Smith and Carron, and he was not considered a suspect.

The investigation centered on Lampkins who was interviewed twice by police. Lampkins denied committing the murders and claimed he was with various family members at the time of the crimes. However, police could not verify Lampkins's purported alibi.

During one of the interviews, Lampkins recounted that Adriana Goodman told him someone named Antwan murdered Carron and Jones. Goodman was acquainted with Carron through social media and later admitted concocting this story as a ruse to induce Lampkins to confess. Lampkins did not confess, but on May 12, 2017, he sent the following message to Carron's mother:

> Ok so out no wur [where] this girl I had been trying to talk to hmu [hit me up] out of no wur saying she knows what happened to livv [Carron]. I said swear on it. She said I'm not lying! She said the dude named Antwan had beef with Ricky and been trying to Rob him so he followed them back to her house. The dude Antwan knocked on the door and ricky answered I'm guessing and he shot

[3] Because the record does not contain verification the named individual was, in fact, a drug dealer, we refer to him throughout by a pseudonym.

him and some how [sic] livv got to get out the house but he chased her and shot her. The girl who told me her brother use [sic] to go with livv. So its [sic] funny to me. And then her brother started hmu talking crazy trying to say I did it.

The Commonwealth argued at trial that Lampkins's message contained details only the killer would know. Lead investigator, Detective Yolanda Baker, testified she did not provide any details of the murders to Lampkins, the media, or any other person at any time. Goodman also testified she did not know any details of the crime beyond those reported in the media.

Additional evidence pointed to Lampkins's involvement in the murders. Cell-phone data showed Lampkins traveling from the area near his home to the area near Carron's apartment just prior to the murders. Surveillance video also captured a silver car matching the one owned by Lampkins coming to the vicinity of the apartment complex prior to the murders and leaving the area just as police were responding to the 911 call.

Lampkins was indicted on two counts of murder, first-degree burglary, possession of a handgun by a convicted felon, violation of a protective order, and tampering with physical evidence. The tampering with physical evidence charge was dismissed prior to trial.

At trial, Lampkins continued to deny his guilt and presented an alleged alternative perpetrator defense ("aaltperp") defense. Specifically, he claimed Smith could have possibly killed Carron and Jones. Lampkins further attempted to cast doubt on the integrity and thoroughness of the police investigation.

6

After the Commonwealth concluded its case-in-chief, the trial court granted a directed verdict on the first-degree burglary charge. The jury convicted Lampkins on the remaining charges and recommended a sentence of life imprisonment without the possibility of parole. The trial court sentenced Lampkins in accordance with the jury's recommendation. This appeal followed.

## ANALYSIS

### A. Victims' Toxicology Reports were Properly Excluded

Lampkins first argues the trial court erred by excluding evidence that both victims' blood contained the presence of marijuana at the time of their deaths. He further contends the trial court should have revisited its pre-trial ruling, sua sponte, when a witness's trial testimony differed from her previous out-of-court statements. We disagree.

The autopsies of Carron and Jones revealed the presence of marijuana in their systems. Specifically, Carron's blood contained 6.3 ng/ml of Tetrahydrocannabinol (THC)[4] and 70.8 ng/ml of TH-COOH[5], and Jones's blood contained 7.1 ng/ml of THC and 9.7 ng/ml of TH-COOH. The Commonwealth filed a motion in limine to exclude this evidence, which the trial court granted as irrelevant and potentially confusing to the jury.

---

[4] Tetrahydrocannabinol, commonly abbreviated as THC, is defined as "[t]he psychoactive isomers present in *Cannabis*, isolated from marijuana. *Stedmans Medical Dictionary* 910420 (2014).

[5] TH-COOH refers to "the major marijuana metabolite, delta-9-tetrahydrocannabinol-9-carboxylic acid[.]" David Evans, 1 *Drug Testing Law Tech. & Prac.* § 4:144 (2023).

7

A criminal defendant's right to present a complete defense "includes both the right to confront witnesses against him with evidence reasonably suggestive of bias as well as the right to present evidence reasonably suggestive that someone else committed the charged crime." *Malone v. Commonwealth*, 364 S.W.3d 121, 127 (Ky. 2012) (internal citations omitted). However, this right does not permit a defendant "to present unsupported theories in the guise of cross-examination and invite the jury to speculate as to some cause other than one supported by the evidence." *Id.* (quoting *Davenport v. Commonwealth*, 177 S.W.3d 763, 772 (Ky. 2005)). This is an issue of basic relevance under KRE[6] 401 which defines "relevant evidence" as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

In *Malone*, we specifically held "[t]he mere fact that a victim had . . . alcohol in his blood, or the fact that a witness drank, used drugs, and knew other people who did, does not, without more, permit a reasonable inference either that the crime was drug or alcohol related or that the witness was lying or was involved in the crime." 364 S.W.3d at 127. We review a trial court's ruling to admit or exclude evidence for abuse of discretion. *Commonwealth v. Melton*, 670 S.W.3d 861, 866 (Ky. 2023). An abuse of discretion occurs when "the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported

---

[6] Kentucky Rules of Evidence.

8

by sound legal principles." *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky. 1999).

We cannot conclude the trial court abused its discretion by excluding the toxicology evidence upon an application of the facts presented at the time of its ruling. The trial court noted the absence of any evidence to establish the timeframe in which the drugs were ingested. Additionally, there was no evidence that Smith sold the victims the drugs within any specific period of time. Lampkins further failed to produce evidence of any disagreement or hostility between Smith and the victims. At most, the evidence showed that Smith was generally known to have sold drugs to residents of the apartment complex. Under *Malone,* these facts simply do not establish a relevant connection between the victims' use of marijuana and the circumstances of their deaths. 364 S.W.3d at 127.

Lampkins further argues, however, that the trial court should have revisited its pre-trial ruling when Jackson testified at trial that Carron knew Smith and had previously purchased marijuana from him. This issue was not preserved and Lampkins requests palpable error review under RCr[7] 10.26, which states:

> A palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.

---

[7] Kentucky Rules of Criminal Procedure.

9

A palpable error is "easily perceptible, plain, obvious and readily noticeable." *Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006). To demonstrate manifest injustice, a party must show the "probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law." *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky. 2006) (quoting *Burns v. Level*, 957 S.W.2d 218, 222 (Ky. 1997)). In other words, a palpable error occurs where "the defect in the proceeding was shocking or jurisprudentially intolerable." *Id.* at 4.

Undoubtedly, Jackson's trial testimony was a surprise to both parties. Toward the conclusion of direct examination, the Commonwealth asked Jackson if she knew Smith. Jackson replied she did not. The Commonwealth then inquired whether Jackson remembered stating that Smith looked familiar after being shown a photo during a meeting the week before trial. Jackson testified Smith looked familiar, but that she did not know him. She further explained, "I think I seen him with [Carron] once."

At this point, Lampkins approached the bench and stated he was unsure of what Jackson had said. The Commonwealth repeated Jackson's testimony and clarified that it was inconsistent with her prior out-of-court statements. The trial court then asked Jackson to repeat her answer and speak up. Jackson stated Smith "just looked familiar. He looked like somebody I had seen before." The Commonwealth continued its questioning:

> **Com.**: Now, have you seen him just out and about, have you seen him at the apartment complex, what was it you remember that you told me when we met in my office?

**Jackson**: That he had been around. Like I have seen him around the apartment with her [Carron] before.

**Com.**: So, you are saying that you had seen him with [Carron]?

**Jackson**: Yes.

**Com.**: Are you guessing or are you sure? I just want to make sure.

**Jackson**: Nah, I said yes.

**Com.**: Okay, well that's not what you told me in my office. Do you remember what we talked about?

**Jackson**: Yeah, I told you that he looked familiar, like somebody that [trails off].

**Com.**: Sold weed maybe to people in the apartment complex?

Before Jackson could answer, the trial court asked the parties to approach the bench and informed the Commonwealth it was not proper to question the witness in that manner. The Commonwealth resumed its questioning and Jackson eventually testified, "I knew [Smith] sold weed to [Carron], that was it, that's why I said he looked familiar."

The parties again approached the bench where Lampkins claimed the Commonwealth had withheld exculpatory evidence. The Commonwealth responded that Jackson's testimony contradicted her previous statements. It was then agreed the Commonwealth would be permitted to conclude its questioning of Jackson and any additional motions would be entertained by the trial court on the following day.

Subsequently, the trial court granted Lampkins's request to conduct an evidentiary hearing outside the presence of the jury for the purpose of

11

determining the substance of Jackson's prior statements to the Commonwealth. At the hearing, Jackson affirmed she had previously told the Commonwealth that Smith sold marijuana to Carron.

After the Commonwealth declined to cross-examine Jackson, Lampkins moved the trial court to dismiss the indictment for failure to disclose exculpatory evidence. The trial court did not immediately rule upon the motion and permitted the Commonwealth to question Mary Forman, a victim's advocate, who was present at the meeting with Jackson. Forman contradicted Jackson's account of the meeting and stated Jackson had previously denied ever seeing Carron with Smith or otherwise having knowledge that Carron purchased marijuana from him.

Lampkins then renewed his motion to dismiss and explicitly informed the trial court he was not asking for a mistrial. The trial court denied the motion because it was not persuaded the Commonwealth committed any misconduct. However, the trial court precluded the Commonwealth from calling Forman as a rebuttal witness at trial[8] or otherwise referring to its prior meeting with Jackson. Effectively, the trial court allowed Jackson's testimony on direct examination to stand unrebutted. Lampkins subsequently declined to cross-examine Jackson.

---

[8] Forman had been sitting in the courtroom throughout the trial. Thus, the trial court reasoned her testimony at trial would violate its order requiring the separation of witnesses.

12

Although Lampkins declined to request the trial court to revisit its prior ruling excluding the toxicology reports, he now asserts for the first time that the trial court should have reconsidered the issue sua sponte. In our view, Jackson's surprise trial testimony does not alter the relevancy analysis. Jackson's testimony merely showed Carron knew Smith had purchased marijuana from him on various unspecified occasions. Jackson did not testify Carron purchased drugs from Smith on the day of the murders. Again, there was no evidence of any disagreement or ill will between Carron and Smith. Lampkins's bare assertion that "the illicit nature of a drug deal infers a motive to kill" is purely speculative and does not comport with our reasoning in *Malone.* 364 S.W.3d at 127.

Additionally, our decision in *Brown v. Commonwealth*, 416 S.W.3d 302, 310 (Ky. 2013), refutes Lampkins's contention that the presence of marijuana in the victims' systems was sufficient to indicate recent use. In *Brown*, we held the trial court properly excluded evidence of a murder victim's toxicology report where an expert witness "could not testify if the victim used marijuana on the day of the shooting, nor could she testify as to the amount of marijuana consumed or the effect the marijuana had on the victim." *Id.* Here, Lampkins failed to proffer any evidence on these necessary connective details. Thus, we cannot conclude the trial court committed error, much less palpable error, by failing, sua sponte, to revisit its prior evidentiary ruling.

13

## B. Trial Court did not Abuse its Discretion by failing to Instruct the Jury to Accept a Judicially Noticed Fact

Lampkins next argues the trial court erred by refusing to instruct the jury to accept a judicially noticed fact. We disagree.

Following Jackson's testimony that Carron knew Smith and had purchased marijuana from him, Lampkins moved the trial court to take judicial notice that, on March 13, 2023, the Commonwealth disclosed to him that Smith's DNA was found in the parking lot outside Carron's apartment. The trial court initially questioned the need to take judicial notice of this fact when the date of disclosure appeared on the face of the record. The Commonwealth added it did not dispute the date of discovery. Lampkins then informed the trial court he would be requesting an instruction. No further discussion on the topic occurred at that time.

After the close of proof, Lampkins tendered the following proposed instruction:

> Lieutenant Donny Burbrink testified that he received a letter from the Kentucky State Police Lab dated September 21, 2021, regarding [Smith's] DNA on the Swisher Sweets Package collected at 139 East Kingston Avenue on April 14, 2017. The Commonwealth did not provide this information to the Defendant until March 13, 2023. You may draw all fair and reasonable inferences from the fact that the Commonwealth did not disclose this evidence for eighteen (18) months.

The Commonwealth objected to the proposed instruction arguing the date of discovery had not been placed into evidence. Additionally, the Commonwealth argued there was no evidence of bad faith which would justify a missing evidence instruction. Lampkins clarified he was requesting the court to take

14

judicial notice under KRE 201 as opposed to a missing evidence instruction. The trial court indicated it had taken judicial notice of its records but nevertheless refused to instruct or otherwise admonish the jury. Instead, the trial court informed Lampkins he could address the date of disclosure during closing argument.

The doctrine of judicial notice was known at common law and is founded on "two maxims, that what is known need not be proved, 'manifesta non indigent probatione,' and it matters not what is known to the judge if it is not known to him judicially, 'non refert quid notum sit judici, si notum non sit in forma judicii[.]'" *Riley v. Wallace*, 188 Ky. 471, 222 S.W. 1085, 1086 (1920). This common law rule is now codified in KRE 201. *Doe v. Golden & Waters, PLLC*, 173 S.W.3d 260, 264 (Ky. App. 2005) (citing Robert G. Lawson, *The Kentucky Evidence Law Handbook*, § 1.00 [5][d], at 19 (4th ed. 2003)). The purpose of judicial notice

> is a rule of convenience that allows a court to use commonly-known assumptions of fact as evidence. In doing so, however, the rule bypasses some of the fundamental requirements for verification and authenticity that otherwise safeguard the integrity of evidence.

*Marchese v. Aebersold*, 530 S.W.3d 441, 447 (Ky. 2017).

KRE 201(a) explicitly limits the scope of judicial notice to adjudicative facts. While the Kentucky Rules of Evidence do not define the term "adjudicative facts," we have previously looked to interpretations of FRE[9] 201

---

[9] Federal Rules of Evidence.

for guidance.  *Clay v. Commonwealth*, 291 S.W.3d 210, 218 (Ky. 2008).

Professor Lawson explained the meaning of adjudicative facts by quoting the

Advisory Committee's Note to Subdivision (a) of FRE 201:

> When a court or an agency finds facts concerning the immediate
> parties—who did what, where, when, how, and with what motive or
> intent—the court or agency is performing an adjudicative function,
> and the facts are conveniently called adjudicative facts. . . .  *Stated
> in other terms, the adjudicative facts are those to which the law is
> applied in the process of adjudication.  They are the facts that
> normally go to the jury in a jury case.*  They relate to the parties,
> their activities, their properties, their businesses.

Robert G. Lawson, *Kentucky Evidence Law Handbook* § 1.00[1][c] (2023)

(emphasis added).

Similarly, adjudicative facts have been described as "the ultimate facts in

the case, plus those evidential facts sufficiently central to the controversy that

they should be left to the jury unless clearly indisputable."  *Snell v. Suffolk

Cnty.*, 782 F.2d 1094, 1105 (2nd Cir. 1986) (quoting 21 C. Wright & K.

Graham, *Federal Practice and Procedure: Evidence* § 5103 at 478 (1977)).

Adjudicative facts are primarily[10] distinguished from legislative facts which "do

not usually concern the immediate parties but are general facts which help the

tribunal decide questions of law and policy and discretion."  *McKinstry v. Wells*,

---

[10] The law also recognizes a third category of "non-evidence" facts that pertain to the common process of human reasoning and "the capacity to do this with competent judgment and efficiency, [which] is imputed to judges and juries as part of their necessary mental outfit."  FRE 201, Advisory Committee's Note, Subdiv. (a). (quoting Thayer, *Preliminary Treatise on Evidence* 279-80 (1898)).  For example, "[w]hen a witness in an automobile accident case says 'car,' everyone, judge and jury included, furnishes, from non-evidence sources within himself, the supplementing information that the 'car' is an automobile, not a railroad car, that it is self-propelled, probably by an internal combustion engine, that it may be assumed to have four wheels with pneumatic rubber tires, and so on."  *Id.*

16

548 S.W.2d 169, 173 (Ky. 1977) (quoting 1 K. Davis *Administrative Law Treatise*, § 7.02, p. 413 (1958)). Because the circumstances of every legal dispute invariably differ, the question of whether a particular fact is adjudicative is necessarily case and context specific. "It is not surprising, then, to find that a fact may be judicially noticeable in one place and not in another, for the basic reasons for judicial notice mark its limits." Keeffe, Landis & Shaad, *Sense and Nonsense About Judicial Notice*, 2 Stan. L. Rev. 664, 667 (1950).

Moreover, to properly be the subject of judicial notice, an adjudicative fact "must be one not subject to reasonable dispute" and constitute information that is either:

> (1) Generally known within the county from which the jurors are drawn, or, in a nonjury matter, the county in which the venue of the action is fixed; or

> (2) Capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

KRE 201(b). As in *Clay*, 291 S.W.3d at 217, "[o]nly the latter is at issue in this case under what has been deemed the 'authoritative sources' test." (quoting *Lawson*, at § 1.00[3][c]). Examples of the types of facts which may be judicially noticed under this test include "scientific principles, dates, locations, historical facts and the like." *Lawson*, at § 1.00[2][c] (quoting Evidence Rules Study Committee, Kentucky Rules of Evidence—Final Draft, p. 16 (Nov. 1989)). Additionally, "it is a well-established principle that a trial court may take judicial notice of its own records and rulings, and of all matter patent on the

17

face of such records, including all prior proceedings in the same case." *M.A.B. v. Cabinet for Health & Fam. Servs.*, 456 S.W.3d 407, 412 (Ky. App. 2015).

To determine whether judicial notice should be taken under the authoritative sources test, "[t]he judge should ask two questions: (1) Does the source provide the *precise fact* to be noticed; and (2) Is the source accurate?" *Clay*, 291 S.W.3d at 217 (quoting *Lawson*, at § 1.00[3][c]). Once judicial notice of adjudicative fact has been taken, "[t]he court shall instruct the jury to accept" the fact as conclusive. KRE 201(g).

This Court takes a "restrictive interpretation" of KRE 201 and "construe[s] [it] as setting a high standard for admitting evidence by judicial notice[.]" *Marchese*, 530 S.W.3d at 447. Indeed, "[t]he power of taking judicial notice should be exercised with caution, and any doubt should be resolved in favor of a refusal to exercise such power." 2 *Wharton's Criminal Evidence* § 5:10 (15th ed.) (footnote omitted). We review a trial court's failure to instruct the jury to accept a judicially noticed fact for abuse of discretion. *Pozo-Illas v. Commonwealth*, 671 S.W.3d 118, 129 (Ky. 2023).

Here, we do not perceive the timing of discovery to have been an adjudicative fact for the jury to consider. The focus and "central concern" of a criminal trial is "the ultimate question of guilt or innocence." *Stone v. Powell*, 428 U.S. 465, 490 1976); *see also Oakes v. Commonwealth*, 320 S.W.3d 50, 56 (Ky. 2010). Facts that are consequential to the determination of a criminal action include facts "tending to prove an element of the offense" and also facts "tending to disprove a defense." *Springer v. Commonwealth*, 998 S.W.2d 439,

18

449 (Ky. 1999). Additionally, a defendant is entitled to elicit facts necessary to present a defense. *Melton*, 670 S.W.3d at 866. This standard of relevancy is flexible enough to allow both parties "to present a complete, un-fragmented, un-artificial picture of the crime . . . including necessary context, background and perspective." *Id.* (quoting *Major v. Commonwealth*, 177 S.W.3d 700, 708 (Ky. 2005)).

Simply put, the date Lampkins received discovery from the Commonwealth is not relevant to the determination of the present action because it lacks any tendency to prove whether he committed the charged offenses or otherwise establish his defense. Certainly, the circumstances surrounding the police investigation were relevant to Lampkins's defense that Smith was the actual perpetrator, and he was permitted to develop evidence in this regard to cast doubt on the integrity of the investigation. The timing of discovery, however, is a litigation event which is a step removed from those facts necessary "to 'complete the story of the crime[.]'" *Id.* (quoting *Webb v. Commonwealth*, 387 S.W.3d 319, 326 (Ky. 2012)).

Furthermore, if a defendant is aggrieved, prior to the conclusion of trial, such that the withholding of information by the prosecution "creates a reasonable doubt that would not otherwise exist[,]" the issue is whether a due process violation has occurred.[11] *See Timmons v. Commonwealth*, 555 S.W.2d

---

[11] Notably, Lampkins has not claimed a discovery or other due process violation in connection with the disclosure of the DNA evidence at any point throughout these proceedings.

234, 240 (Ky. 1977) (quoting *Romans v. Commonwealth*, 547 S.W.2d 128, 131 (Ky. 1977)). When material evidence is wrongfully withheld, "counsel for the aggrieved party must exhaust all reasonably available means to have the error rectified (including, for example, a motion that the trial be recessed until the facts can be ascertained) before he can be in a position to demand a mistrial." *Id.* (quoting *Romans v. Commonwealth*, 547 S.W.2d 128, 131 (Ky. 1977)). Thus, the facts attendant to an alleged due process violation inform a legal question to be resolved by the trial court, rather than a factual question to be decided by the jury.

Certainly, a trial court may take judicial notice of its own records when appropriate.[12] However, in the present context, the date of discovery was not an adjudicative fact for the jury to consider because such information has no bearing on the ultimate issue of guilt which is the central factual question in dispute. Therefore, we hold the trial court should not have taken judicial notice in the manner requested by Lampkins. Moreover, because KRE 201 was inapplicable, the trial court was under no obligation to instruct the jury in accordance with the rule's provisions. *See Pozo-Illas,* 671 S.W.3d at 131 (holding trial court did not abuse its discretion by failing to instruct the jury on the legal meaning of road sign despite taking judicial notice because legal meaning of sign was not an adjudicative fact). Further, any possible error in

---

[12] Had Lampkins asserted a discovery or due process violation, the timing of discovery would have been an adjudicative fact for the trial court to resolve because, in that context, such date is a fact to which the law is applied.

20

this regard inured to Lampkins's benefit because, without the inappropriate taking of judicial notice, he would not otherwise have been permitted to argue the timing of discovery to the jury. Thus, he cannot demonstrate prejudice. *See Elery v. Commonwealth*, 368 S.W.3d 78, 90 (Ky. 2012) (noting "[e]rrors which inure to the benefit of the defendant are not prejudicial.").

## C. Trial Court Properly Refused to Strike Two Jurors for Cause

For his third contention of error, Lampkins argues the trial court erred by failing to strike two prospective jurors for cause.[13] Specifically, he argues these jurors were incapable of accepting the presumption of innocence. We disagree.

RCr 9.36(1) provides, "[w]hen there is reasonable ground to believe that a prospective juror cannot render a fair and impartial verdict on the evidence, that juror shall be excused as not qualified." This rule "is the only standard for determining whether a juror should be stricken for cause." *Sturgeon v. Commonwealth*, 521 S.W.3d 189, 193 (Ky. 2017). "To determine whether a reasonable ground existed to doubt the challenged juror's ability to render a fair and impartial verdict, the trial court 'must weigh the probability of bias or prejudice based on the entirety of the juror's responses and demeanor.'" *Id.* at 196 (quoting *Sluss v. Commonwealth*, 450 S.W.3d 279, 282 (Ky. 2014)). "When there is uncertainty about the impartiality of a juror, that juror should be

---

[13] We note this issue was properly preserved for review in accordance with the six-step procedure established in *Floyd v. Neal*, 590 S.W.3d 245, 250 (Ky. 2019).

21

stricken." *Moulder v. Commonwealth,* 681 S.W.3d 49, 52 (Ky. 2023). We review a trial court's refusal to strike a juror for cause for abuse of discretion. *Id.*

Prior to the commencement of voir dire, the trial court admonished the prospective jurors that "[a]n indictment does not create any inference of guilt against the defendant" and Lampkins should be convicted only if the jurors believe him to be guilty beyond a reasonable doubt based solely on the evidence at trial. During its examination, the Commonwealth inquired into the venire's prior experiences with law enforcement and the following discussion occurred:

> **Com.**: We all have different views because we see things on media, T.V. We see things on social media. We hear things. Is the system right, correct, fair? 2881819, what do you think?
>
> **Juror 2881819**: I think processes like this gives people a fair chance to prove their innocence.

The Commonwealth continued to examine other jurors regarding their experiences and perceptions of the legal system. Various responses, both positive and negative, were elicited before the following exchanged occurred:

> **Com.**: Obviously, we're on a criminal case. Police are a key part of a criminal case. Thinking about that, who would say that they tend to agree with Juror 3090458 or thinks more along those lines that there are systemic problems? Yes, 3179363. Yes, sir.
>
> **Juror 3179363**: I think it was said earlier, that we have two different types of people, we have good police, bad police. I'd like to say that I believe in the system. So in my opinion, I mean, of course there are bad actors. However, I like to think that anybody that's dealing with the law enforcement system, there's a reason for that. There's got to be probable cause, otherwise the case wouldn't be pursued. And I don't have any law enforcement background or anything like that.

At the conclusion of its examination, the Commonwealth addressed the venire:

22

> Does everybody understand that Daquan Lampkins is presumed innocent as he sits there? That's a bedrock of our system of justice, the presumption of innocence. And the burden of proof on the Commonwealth, here in Kentucky, is proof beyond a reasonable doubt. It's not beyond all doubt. It is stated as proof beyond a reasonable doubt. Everybody understand that, that he is actually cloaked right now with the presumption of innocence? That is important.

None of the prospective jurors, including Jurors 2881819 and 3179363, evinced a lack of understanding regarding the presumption of innocence or otherwise communicated any refusal to accept the presumption of innocence in response to the Commonwealth's direct question.

Lampkins returned to presumption-of-innocence issue during his examination of the venire:

> So let's talk about, we talked about the presumption of innocence and what that means. And I think actually the way [the Commonwealth] described it as this "cloak of innocence," I like that. I like that image. The cloak of innocence. So, right now, we are going to ask you to deliberate. What is your verdict? Anyone think the verdict is guilty right now?

Again, none of the prospective jurors, including Jurors 2881819 and 3179363, indicated they had prejudged Lampkins's guilt or otherwise expressed any difficulty accepting the presumption of innocence.

The standard for disqualification under RCr 9.36 does not require a trial court to evaluate a juror's responses out-of-context or in a vacuum. *Sturgeon*, 521 S.W.3d at 196. Indeed, in *Sturgeon*, we recognized "a prospective juror's response that appears on its face to be disqualifying may be based upon a misunderstanding of the relevant facts or circumstances[,] and that "[c]larifying questions may be used as needed to ascertain the juror's true attitude about

23

subjects of potential bias." *Id.* at 194. Here, the problematic statements were elicited in response to general questions regarding the jurors' perceptions of law enforcement and the fairness of the legal system. Upon direct questioning pertaining to the presumption of innocence, the prospective jurors expressed no hesitation pertaining to their ability to impartially apply the law. Without some additional demonstration of bias or prejudice, we fail to discern a reasonable ground to doubt the qualifications of these prospective jurors. Thus, we cannot conclude the trial court abused its discretion by declining to strike Jurors 2881819 and 3179363 for cause.

### D. Trial Court Properly Admitted Evidence of Prior Bad Acts

For his fourth contention of error, Lampkins argues the trial court erred by improperly admitting evidence of prior bad acts. Specifically, he argues evidence that Carron would flee to Jackson's apartment whenever he became abusive and evidence of the assault in the car as witnessed by Shaw were inadmissible. We disagree.

Under KRE 404(a), the general rule is that evidence of other crimes is not admissible to show that a defendant is a person of criminal disposition. KRE 404(b) provides an exception to the general rule and provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible:
>
> (1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or

(2) If so inextricably intertwined with other evidence essential to
the case that separation of the two (2) could not be accomplished
without serious adverse effect on the offering party.

This list of "other purposes" is "illustrative rather than exhaustive." *Rodriguez v. Commonwealth,* 107 S.W.3d 215, 219 (Ky. 2003) (quoting *Colwell v. Commonwealth,* 37 S.W.3d 721, 725 (Ky. 2000)).

Trial courts must cautiously admit evidence of other crimes, wrongs, or acts under KRE 404(b) "with an eye towards eliminating evidence which is relevant only as proof of an accused's propensity to commit a certain type of crime." *Bell v. Commonwealth,* 875 S.W.2d 882, 889 (Ky. 1994). To determine the admissibility of uncharged acts, courts must ascertain whether the evidence is relevant for a permitted purpose, probative of the uncharged act, and not unduly prejudicial under KRE 403. *Id.* As with other evidentiary rulings, the applicable standard of review is abuse of discretion. *Id.*

This Court has long recognized that evidence of a defendant's prior threats, violence, and animosity against the victim of the charged offenses is "'almost always admissible,' under KRE 404(b), because it will almost always be significantly probative of a material issue aside from the defendant's character." *Jenkins v. Commonwealth,* 496 S.W.3d 435, 458 (Ky. 2016) (quoting *Noel v. Commonwealth,* 76 S.W.3d 923, 931 (Ky. 2002)). Although this "does not mean, of course, that evidence of prior acts against the same victim is automatically admissible—relevance to a material issue and probativeness must be shown, and the possibility of undue prejudice must still be considered—but our experience with these cases has taught that in most of

25

them the *Bell* inquiry leads to admission." *Jenkins*, 496 S.W.3d at 458. Specifically, "evidence of prior threats and animosity of the defendant against the victim is admissible as evidence of motive, intent or identity whereas evidence of prior threats or violence against an unrelated third-party is generally regarded as inadmissible character evidence[.]" *Davis v. Commonwealth*, 147 S.W.3d 709, 722 (Ky. 2005) (internal citations omitted).

In the present appeal, we have no difficulty concluding the evidence of prior bad acts was properly admitted.[14] Contrary to Lampkins's argument, the scope of our caselaw admitting evidence of prior violence by the defendant against the victim is not limited to situations where the defense is the lack of *mens rea*[15] as in cases involving claims of self-defense, accident, or extreme emotional disturbance. In *White v. Commonwealth*, 178 S.W.3d 470, 476 (Ky. 2005), we recognized the "[n]eed [for this type of evidence] is greatest and relevance is clearest where the defense is denial of the criminal act[.]" Such need is evident in the present matter because Lampkins denied committing the charged offenses thereby placing his motive, intent, and identity squarely at issue. *Sherroan v. Commonwealth*, 142 S.W.3d 7, 18 (Ky. 2004).

Additionally, Lampkins's argument that the Commonwealth failed to demonstrate a substantial similarity between the charged crimes and the prior

---

[14] In light of our conclusion this evidence was admissible under KRE 404(b), we need not consider Lampkins's alternative argument concerning the applicability of KRE 406, which governs evidence of habit.

[15] "Mens rea" is defined as "[t]he state of mind that the prosecution, to secure a conviction, must prove that a defendant had when committing a crime[.]" *Mens Rea, Black's Law Dictionary* (11th ed. 2019).

bad acts is without merit. The requirement of substantial similarity is a prerequisite to the use of modus operandi[16] evidence to prove identity. *Woodlee v. Commonwealth*, 306 S.W.3d 461, 465 (Ky. 2010). Modus operandi evidence is not the sole means of proving identity under KRE 404(b), however. *Lawson*, at § 2.30[4][f]. Prior bad acts may also be proven to "connect[] [the] defendant to the charged offense through some object or circumstance that coincidentally shows commission of some uncharged crime." *Id.* We perceive admissibility of acts of prior violence by the defendant against the victim to be a prime example of a situation where identity may be proven by a circumstantial connection without the necessity of showing substantial similarity.

Here, the trial court properly conducted the *Bell* analysis before admitting the evidence of prior bad acts. The evidence of Lampkins's prior abuse of Carron was clearly offered for a legitimate purpose other than that of character as it was probative of his motive, intent, and identity. Further, the probative value of this evidence outweighed the potential for undue prejudice. Therefore, we discern no abuse of discretion.

### F. Erroneous Admission of Reenactment was Harmless

Finally, Lampkins argues the trial court erred by permitting the Commonwealth to dramatize the manner of Jones's death in connection with

---

[16] "Modus operandi" is defined as "[a] method of operating or a manner of procedure; esp., a pattern of criminal behavior so distinctive that investigators attribute it to the work of the same person[.]" *Modus Operandi, Black's Law Dictionary* (11th ed. 2019).

the expert testimony of the medical examiner, Dr. Jeffrey R. Springer. We agree the Commonwealth failed to lay a proper foundation for this demonstrative evidence but deem any error to have been harmless.

On the weekend prior to trial, the Commonwealth notified Lampkins of its intent to use a model door as demonstrative evidence in connection with Dr. Springer's testimony. On direct examination, Dr. Springer detailed his findings pertaining to Jones's autopsy. He testified the cause of Jones's death was a gunshot wound to the torso and that the manner of death was homicide. Dr. Springer further described the nature and location of Jones's wounds and the approximate pathway the fatal bullet traversed through his body.

At this point, the Commonwealth was permitted, over Lampkins's objection, to perform a demonstration illustrating its theory of how Jones sustained his fatal injuries. The model door was brought into the courtroom. An assistant prosecutor assumed the role of Jones, and Dr. Springer stepped down from the witness stand to mark the approximate location of Jones's wounds on the assistant prosecutor's shirt. The Commonwealth informed the jury about the relative difference in height between Jones and the assistant prosecutor. The Commonwealth then proceeded to narrate a reenactment of how it believed Jones's shooting occurred.

The primary investigator in the case, Detective Baker, portrayed the shooter. Unbeknownst at first to the trial court and Lampkins, Detective Baker was holding a gun. It was not immediately apparent that the gun was not real and actually a prop. The shooter knocked on the model door and the victim

28

answered. As the door opened, the Commonwealth stated that a shot was fired and the victim sustained a graze wound to his leg. At this point and for the remainder of the demonstration, the shooter's body was obscured from view on the video record. The Commonwealth described a struggle at the door to shut it, which was then reenacted before the jury. While the victim was hunched over at the door, the Commonwealth narrated how the fatal shot occurred. The Commonwealth then asked Dr. Springer if, based on his findings, the demonstration reflected a possible scenario to which he replied that it did. The entire demonstration lasted approximately two minutes.

Lampkins's initial objection to the demonstrative evidence at trial was that the proposed demonstration called for Dr. Springer to speculate on how the shooting occurred. Under similar circumstances, we have distinguished between an objection to the use of demonstrative evidence, as such, and an objection to the scope of a witness's expertise. *Hargroves v. Commonwealth*, 615 S.W.3d 1, 10 (Ky. 2021). When a medical examiner is otherwise qualified to testify as an expert witness in a particular case, he or she may properly opine on the location of wounds and the trajectory of bullets in response to a party's questions in connection with the reenactment of a proposed scenario. *Id.* at 12. We cannot conclude the trial court abused its discretion by overruling the objection to the demonstration on the ground it called for the witness to speculate.

After the demonstration concluded, however, Lampkins also moved the trial court to admonish the jury to disregard the reenactment in its entirety

29

because the Commonwealth did not provide notice that a gun would be used. He further objected to the manner in which the use of the gun had been dramatized. The trial court refused to admonish the jury to disregard the entire demonstration, but expressed concern regarding the prejudicial effect of the gun and instructed the jury as follows:

> Ladies and gentlemen of the jury, I just want to take a minute to let you know that neither the Court nor the defense was aware that demonstration would involve the use of what I now know was a fake gun. The gun that was used in that demonstration, the fake gun, I know that Detective Baker was not using a real gun, is not the gun that was used in this case. We have no idea if it is even similar to the gun used in this case and there is no gun that you will be presented with in relation to this case.

Kentucky law presumes a jury will "follow an admonition to disregard evidence and the admonition thus cures any error." *Johnson v. Commonwealth*, 105 S.W.3d 430, 441 (Ky. 2003) (citing *Mills v. Commonwealth*, 996 S.W.2d 473, 485 (Ky. 1999)). However, this presumption may be overcome in two situations: "(1) when there is an overwhelming probability that the jury will be unable to follow the court's admonition *and* there is a strong likelihood that the effect of the inadmissible evidence would be devastating to the defendant; or (2) when the question was asked without a factual basis *and* was 'inflammatory' or 'highly prejudicial.'" *Id.* (citations omitted).

Here, we do not perceive the trial court's admonition to have been effective under the second exception to the general rule. The prop gun was apparently chosen at random and used without any prior notice or explanation to the jury. Thus, it lacked a factual basis. Moreover, as discussed in detail

30

below, our precedents recognize the significant potential for undue prejudice where demonstrative evidence lacks some degree of fair comparison to real-world circumstances. *Rankin v. Commonwealth*, 327 S.W.3d 492, 499 (Ky. 2010). In further support of our conclusion regarding the inefficacy of the admonition, the trial court tellingly remarked on the record that the jury "would not be able to get [the demonstration] out of their mind anyway." We now turn to consider whether the use of the prop gun was appropriate.

This Court has generally permitted the use of a demonstration in the form of a reenactment "during the presentation of evidence while it is subject to exploration on cross-examination." *Hargroves*, 615 S.W.3d at 10. Despite our longstanding approval, the admissibility of demonstrative evidence is not specifically addressed by the Kentucky Rules of Evidence. *Rankin*, 327 S.W.3d at 498. Instead, such evidence is subject to the general rules of relevancy contained in KRE 402 and 403. *Id.* In *Rankin*, after noting the relative dearth of Kentucky caselaw pertaining to experiment evidence,[17] we applied the standard contained in federal precedents which "have held that experiment evidence is generally admissible if it bears upon a material issue and if the proponent establishes a sufficient similarity between the conditions of the

---

[17] While *Rankin* dealt specifically with evidence of an experiment as opposed to a demonstration, we note "[t]here is no formal distinction between an in-court demonstration and an in-court experiment, although it might be said that a demonstration becomes an experiment when the witness, particularly an expert witness, attempts to reenact some aspect of an event in order to show a specific result that is at issue in the trial." 2 *McCormick On Evid.* § 217 (8th ed.). Notwithstanding any semantic difference between an experiment and demonstration, we conclude the same legal standard applies to both under *Rankin*.

31

experiment and those of the event in question." *Id.* (citing *United States v. Williams*, 461 F.3d 441 (4th Cir. 2006); *United States v. Baldwin*, 418 F.3d 575 (6th Cir. 2005); *United States v. Gaskell*, 985 F.2d 1056 (11th Cir. 1993); and *Four Corners Helicopters, Inc. v. Turbomeca, S.A.*, 979 F.2d 1434 (10th Cir. 1992)).

The proponent of demonstrative evidence bears the burden of establishing sufficient similarity. *Lawson*, at § 11.15[1] (citing *United States v. Wanoskia*, 800 F.2d 235, 237–238 (10th Cir. 1986)). The requisite degree of sufficient similarity "depends on the purpose for which the evidence is being offered." *Rankin*, 327 S.W.3d at 498. We explained:

> If the experiment is offered as a simulation of actual events, then there must be a substantial similarity between the experimental conditions and those which are the subject of the litigation. If, on the other hand, the experiment is not meant to simulate what happened, but rather to demonstrate some general principle bearing on what could or what was likely to have happened, then the similarity between the experimental and the actual conditions need not be as strong.

*Id.* at 498-99 (citations omitted).

The line demarcating the simulation of actual events and the demonstration of general scientific principles can be "very difficult to draw." *McKnight v. Johnson Controls, Inc.*, 36 F.3d 1396, 1402 (8th Cir. 1994) (citing *Gilbert v. Cosco Inc.*, 989 F.2d 399, 403 (10th Cir. 1993)). In the absence of a bright line rule, "the critical point is not one of labels." *Id.* (quoting *Fusco v. General Motors Corp.*, 11 F.3d 259, 264 (1st Cir. 1993)). "Instead, the key question is 'whether the demonstration is sufficiently close in appearance to

the original [incident] to create the risk of misunderstanding by the jury, for it is that risk that gives rise to the special requirement to show similar conditions.'" *Id.* (quoting *Fusco*, 11 F.3d at 264). Troublesome cases result "where some principles of some kind may be demonstrated but in a fashion that looks very much like a recreation of the event that gave rise to the trial." *Id.* (quoting *Fusco*, 11 F.3d at 264 n.5). "The more blurred that distinction [between a simulation and demonstration] becomes, the greater the risk for prejudice." *Gilbert*, 989 F.2d at 403.

Regardless of where certain evidence falls on the spectrum between simulation and demonstration, the overriding consideration is that "the similarities must be such as to afford a fair comparison, and the court should be mindful of the significant risk of undue prejudice inherent in dramatic presentations offered to the jury as reenactments of the events being litigated." *Rankin*, 327 S.W.3d. at 499. Ultimately, "[i]f the experiment evidence is sufficiently similar to be probative and if its probative value is not outweighed by undue prejudice, then differences between the experiment and the event at issue go to the weight of the evidence, not its admissibility." *Id.* As an evidentiary ruling, we review a trial court's decision for abuse of discretion. *Id.*

We cannot conclude the Commonwealth made the requisite foundational showing of a fair comparison here. The use of the prop gun is especially problematic because it was chosen at random without any comparison to the type of weapon believed to have been used in the actual murders. Moreover, the Commonwealth failed to alert the trial court and Lampkins to its intended

33

use of this dramatic device.  Consequently, the jury was unaware that the gun was merely a random prop at the time the reenactment unfolded.  Lampkins was then left in the position to obtain an admonition after the fact, which the trial court acknowledged would likely be ineffective.  The purpose of an in-court demonstration is "to illustrate or explain what the witness is trying to describe."  2 *McCormick On Evid.* § 217 (8th ed.).  It is not an invitation for the jury to speculate.

Additionally, our approval of a similar reenactment in *Hargroves* accounted for the fact the jury was apprised of relevant differences prior to the demonstration.  615 S.W.3d at 11; *see also Daniel v. Commonwealth*, 607 S.W.3d 626, 642-43 (Ky. 2020) (noting demonstration of bullet trajectory on a model head was admissible under *Rankin* analysis where, among many factors, jury was informed model was not to scale).  In the present appeal, we are also troubled that the jury was not informed of other relevant differences between the conditions of the reenactment and actual events.  While the Commonwealth compared the height of the assistant prosecutor to that of the victim, no additional comparisons were made to contextualize the reenactment.  There was no comparison between the size of the model door and the actual door of Carron's apartment.  Similarly, no comparison was made between Lampkins's body-type and that of the detective who portrayed him.

To be sure, complete identity of these elements is not required, but where a demonstration appears to dramatize actual events, some consideration of sufficient similarity is a necessary precondition to admissibility.  *See Meredith*

34

*v. Commonwealth*, 959 S.W.2d 87, 92 (Ky. 1997) (holding evidence of out-of-court experiment inadmissible where no attempt was made to establish similarity between experiment and actual events). We further note

> [t]he ability to cross-examine is not a substitute for the offering party's burden of showing that a proffered demonstration or experiment offers a fair comparison to the contested events. Particularly where the demonstration unfairly tended to prejudice the jury on the one genuinely contested issue, without providing any significantly probative testimony, neither the cautionary instruction nor the ability to cross-examine was sufficient to cure the error.

*Gaskell*, 985 F.2d at 1062. Under these circumstances, we cannot conclude the reenactment was properly admitted. However, although the Commonwealth failed to establish a proper foundation, this does not end the inquiry.

It is well-established that "a nonconstitutional evidentiary error may be deemed harmless if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error." *Murray v. Commonwealth*, 399 S.W.3d 398, 404 (Ky. 2013) (citing *Kotteakos v. United States*, 328 U.S. 750 (1946)). Under the harmless error standard, we do not ask simply,

> whether there was enough [evidence] to support the result, apart from the phase affected by the error. [The standard] is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

*Id.* (quoting *Kotteaakos*, 328 U.S. at 765.).

An exhaustive review of the present record convinces this Court that the error in admitting the demonstration did not substantially influence the

35

outcome of this case. In a murder prosecution, "[t]he commonwealth does not have to show motive, though, in cases where the commonwealth is resting its case entirely upon circumstantial evidence, it frequently becomes quite important that motive be shown." *Morgan v. Commonwealth*, 228 Ky. 432, 15 S.W.2d 273, 275 (1929).

Here, the circumstantial evidence of Lampkins's motive, intent, and identity was particularly compelling. Carron was shot thirteen times at indeterminate range with seven of those gunshots striking her in the back. The testimony at trial recounted multiple acts of physical abuse that Lampkins perpetrated upon Carron. Because of the ongoing abuse and harassment, Carron obtained an EPO against Lampkins less than five days before the murders. He continued to contact Carron in violation of the EPO. Lampkins called Carron repeatedly during the timeframe leading up to the murders yet he made no further attempts to communicate with her thereafter. The impact of these events on Lampkins's motive to commit both murders was further compounded by Carron's refusal to allow him to return to her apartment because of her relationship with Jones. Additionally, Lampkins's message to Carron's mother revealed specific details of the crimes that, presumably, only the killer would have known.

The Commonwealth also adduced persuasive evidence concerning Lampkins's opportunity to commit the charged offenses. Around the time of the murders, cell-phone data indicated Lampkins was traveling from the area of his home toward Carron's apartment. Surveillance videos taken from

36

cameras posted at the apartment complex also showed a silver vehicle matching the one owned by Lampkins in the vicinity of Carron's apartment at the time of the murders.

Further, the Commonwealth produced substantial evidence to refute Lampkins's alibi and aaltperp defenses. Detective Baker investigated each of the various alibis Lampkins offered for the time of the murders and testified that they did not "pan out." Police did not uncover any connection linking the alleged drug dealer Smith to the murders. Lampkins's reliance on the fact that Smith's DNA evidence was found on a cigar wrapper in the parking lot is unconvincing. The evidence at trial failed to establish any credible motive for Smith to kill Carron and Jones. In consideration of the evidence as whole, we cannot conclude the reenactment swayed the jury's verdict. Therefore, while the trial court erred by allowing the reenactment without a showing of sufficient similarity, we conclude the error was harmless.

## CONCLUSION

Having considered the briefs, the law, and the record, we discern no reversible error. Accordingly, the judgment of the Jefferson Circuit Court is affirmed.

All sitting. All concur.

37

COUNSEL FOR APPELLANT:

Christopher B. Thurman
Louisville Metro Public Defender's Office


COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Joseph A. Beckett
Assistant Attorney General