# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D),  THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE  ACTION.

RENDERED: AUGUST 14, 2025
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2024-SC-0118-MR

JAMIE SIMPSON                                            APPELLANT

V.              ON APPEAL FROM KENTON CIRCUIT COURT
              HONORABLE MARY K. MOLLOY, JUDGE
                      NO. 23-CR-00436

COMMONWEALTH OF KENTUCKY                      APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Despite the existence of a protection order between Jamie Simpson and his wife, A.B., Simpson came to her residence, held her captive, and assaulted and strangled her. A Kenton County Circuit Court jury found Simpson guilty of first-degree burglary, kidnapping, second-degree assault, first-degree strangulation, tampering with a witness, and of being a first-degree persistent felony offender (PFO). The trial court imposed the jury's recommended sentence of sixty years. Simpson now appeals to this Court as a matter of right.

**<u>FACTS AND PROCEDURAL HISTORY</u>**

On February 22, 2023, Jamie Simpson assaulted and strangled his wife, A.B., then held her captive. At the time of the assault, Simpson was under an

order to remain 500 feet away from A.B. which was entered after Simpson assaulted her in November 2022.  Despite this order, Simpson still had contact with A.B. and was staying at her residence.  During Simpson's jury trial, A.B. testified as to the events that transpired.

Simpson went to Walmart on the evening of February 21, 2023, and returned home after A.B. had gone to sleep.  In the early morning hours of February 22, Simpson woke A.B. by sitting on her chest and straddling her torso.  Simpson had looked through the family tablets and photo drives when he came across an old photo of A.B. with another man.  Simpson yelled at A.B. and accused her of cheating.   While sitting on top of A.B., Simpson grabbed her by the throat with both hands and strangled her, making it difficult for her to breathe.  Although A.B. later admitted to one instance of infidelity while Simpson was not staying in the house, she initially denied it.  When A.B. denied her infidelity, Simpson punched her in the face with a closed fist twice.

Simpson and A.B. argued back and forth as Simpson looked through A.B.'s phone.  Simpson told A.B. that they were done, and A.B. said "just let me go." But Simpson told her she was not leaving and that he would leave instead.  Simpson remained between A.B. and the door, making exiting the room untenable.  Simpson called A.B. derogatory names and told her that he would make sure she lost the kids and would never get to see them again.

While A.B. was sitting on the bed, he started strangling her.  Simpson placed both hands on her neck and choked her, making it difficult for A.B. to breathe.  She stated she felt like she was going to pass out and felt as if

2

everything was "closing in." She told herself not to pass out because she feared if she passed out, she would not wake up. During this struggle, A.B. fell between the bed and the nightstand to the floor. While choking A.B., Simpson took her head and hit it on the laminate hardwood floor. Simpson got off her and stepped back, then kicked her in the ribs and stomped on her stomach. She felt like she was going to vomit so she told Simpson she needed to go to the bathroom. He would not let her go alone and stood in the doorway to the bathroom, not allowing her to shut the door while she threw up.

Simpson and A.B. returned to the bedroom and Simpson resumed looking at A.B.'s phone. He looked at the Snapchat application on her phone and found a conversation between her and another man. There were apparently also nude photos saved. According to A.B., Simpson was particularly upset because the other man was "involved with drug testing him at one point and . . . he was black."

Simpson pushed A.B. onto the bed and tried to rip her underwear off, but could not completely tear them. He pulled off her underwear and tried to shove his hand inside her vagina and said "is this what you want?" A.B. locked her legs to prevent Simpson from penetrating her with his hand, and he was ultimately only able to touch the outside of her vagina. After she thwarted his attempt, he stopped and began accusing her of other infidelity. A.B. denied any other infidelity and Simpson said "stop fucking lying to me or I'm going to blow your fucking brains out." A.B. testified that there was a shotgun in the house, but no ammunition.

3

While Simpson berated and assaulted A.B., he grabbed a mason jar that was sitting on the nightstand and hit her in the head several times. He then took a large candle and beat A.B. in the leg, causing significant bruising. Finally, Simpson took his pocketknife and threatened A.B. by sticking the knife against the side of her stomach, just enough to scratch her. He placed the knifepoint against her neck but told her he decided he was not going to kill her.

The physical assault deescalated, and a heated verbal argument continued until A.B.'s alarm went off at 6:00 a.m. A.B. told Simpson they had family court that day, but Simpson told her she was not going anywhere. After A.B. told Simpson that someone would come looking for her if she did not attend the hearing, he agreed to let her go. Simpson helped her pick out clothes and put on makeup to conceal the injuries he inflicted. Simpson stayed with A.B. as she got dressed and as she got the kids out to the car to take them to daycare. Apparently still filled with anger, Simpson told the oldest child that he was not his real father. According to A.B., the child was heartbroken. Simpson stayed at the house while A.B. left to take the children to daycare.

While driving, A.B. received a text from Simpson requesting that she send him money because he was going to get out of town. She sent him $200 and continued to act like they would work things out later. After dropping the children off at daycare, A.B. turned off the location services on her phone and went to the hospital. A.B. reported the assault, and the Covington police were called to the hospital. Police and medical staff documented her injuries, which

4

included bruises to her face, neck, and legs, a scratch to her torso, and cuts to her head.

Officers were dispatched to the residence. Simpson was headed to his vehicle when he noticed police officers walking toward the house. He ran inside and tried to flee out the back door, but an officer confronted him and told him to stop. Simpson disregarded the command, went back inside and barricaded himself. A standoff lasted for several hours. Simpson continually texted A.B. while she was at the hospital and while the standoff continued. Eventually, Simpson surrendered and was placed in custody. While in jail, Simpson messaged and called A.B. multiple times attempting to convince her to change her story or not show up for court. The jail communications were the basis for Simpson's tampering with a witness charge.

Simpson also testified at trial and stated that he found photos of A.B. with another man. Simpson confronted her about it and was particularly upset because he thought she was cheating on him with someone he knew. He testified that he smacked her a few times, grabbed her underneath her chin and shoved her, and that she fell back into the dresser. Simpson testified that they sat on the bed and talked, and when A.B. tried to stand up he picked her up underneath her arms and flung her onto the bed, accidentally tearing her underwear. He denied going into the bathroom with A.B. and denied verbally or physically blocking her from leaving the bedroom, bathroom, or house. While he admitted to hitting A.B. with a candle, he denied hitting her with a mason jar or threatening her with a knife.

5

After a jury trial, Simpson was convicted of first-degree burglary, kidnapping, second-degree assault, first-degree strangulation, tampering with a witness, and being a first-degree persistent felony offender. The trial court imposed a sixty-year sentence, consistent with the jury's recommendation. Simpson now appeals as a matter of right, alleging various errors.

## ANALYSIS

Simpson argues the trial court erred by overruling his motion to give various lesser-included offense instructions, by allowing a barrier to be placed between Simpson and A.B. during A.B.'s testimony, by allowing the Commonwealth to introduce a photo of A.B. demonstrating the alleged strangulation on a hospital doll, and by permitting him to appear in handcuffs during the penalty phase. Simpson also argues that the errors in this case amount to cumulative and reversible error.

### I. The trial court did not err by declining to instruct the jury on lesser-included offenses.

At the close of all evidence, the parties met with the trial court to discuss jury instructions. Simpson requested the trial court give jury instructions for first-degree criminal trespass as a lesser-included offense to first-degree burglary, first- and second-degree unlawful imprisonment as lesser-included offenses to kidnapping, and fourth-degree assault as a lesser-included offense to second-degree assault. The trial court denied defense counsel's requests.

Under Kentucky Rule of Criminal Procedure (RCr) 9.54(1), "it is the duty of the trial court in a criminal case to instruct the jury on the whole law of the case[.]" *Thomas v. Commonwealth,* 170 S.W.3d 343, 348-49 (Ky. 2005). Trial

6

courts must give a lesser-included offense instruction "if, but only if, 'considering the totality of the evidence, the jury might have a reasonable doubt as to the defendant's guilt of the greater offense, and yet believe beyond a reasonable doubt that he is guilty of the lesser offense.'" *Jenkins v. Commonwealth*, 496 S.W.3d 435, 449 (Ky. 2016) (quoting *Commonwealth v. Swift*, 237 S.W.3d 193, 195 (Ky. 2007)). When a trial court declines to give an instruction on a specific claim, the decision is reviewed for an abuse of discretion. *Sargent v. Shaffer*, 467 S.W.3d 198, 204 (Ky. 2015), *overruled on other grounds by Univ. Med. Ctr., Inc. v. Shwab*, 628 S.W.3d 112 (Ky. 2021).

On appellate review, we must determine whether the trial court's decision was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999). We discuss each requested lesser-included offense instruction in turn.

### a. Simpson was not entitled to a criminal trespass instruction as a lesser-included offense to first-degree burglary.

During trial, Simpson asserted that the jury could have found him guilty of first-degree criminal trespass if it believed he violated the court order when he entered the house but did not have the intent to commit any other crime. A person is guilty of burglary in the first degree

> when, with the intent to commit a crime, he or she knowingly enters or remains unlawfully in a building, and when in effecting entry or while in the building or in the immediate flight therefrom, he or she . . . [c]auses physical injury to any person who is not a participant in the crime . . . .

7

Kentucky Revised Statute (KRS) 511.020(1)(b). In contrast, a person is guilty of first-degree criminal trespass "when he or she knowingly enters or remains unlawfully in a dwelling." KRS 511.060(1).

Simpson again argues the jury could have found him not guilty of first-degree burglary and guilty of first-degree criminal trespass if it believed he did not have the "intent to commit a crime" as required by KRS 511.020. The parties stipulated that Simpson was ordered to stay 500 feet away from A.B. Simpson admitted to police that he struck A.B. and hit her with a candle. When testifying at trial, he confirmed that he told the detective those details, and again admitted that he struck A.B. Additionally, Simpson testified that he shoved A.B. down on the bed and when she got back up, he picked her up underneath her arms and slung her back down on the bed. Simpson also admitted there was a no contact order in place. Based on Simpson's own statements and the parties' stipulations, Simpson's unlawful presence in the house and intent to commit another crime was clear. Therefore, the trial court did not abuse its discretion in declining to give a criminal trespass instruction.

### b. Simpson was not entitled to any unlawful imprisonment instructions as lesser-included offenses to kidnapping.

When discussing jury instructions, defense counsel argued that the jury could have found Simpson not guilty of kidnapping and guilty of either first- or second-degree unlawful imprisonment if it believed Simpson restrained A.B. but did not have the intent to "inflict bodily injury" or "terrorize" her. The trial court declined to give any unlawful imprisonment instruction.

8

KRS 509.040 contains various ways a person can effectuate the crime of kidnapping. Relevant to Simpson's argument, "[a] person is guilty of kidnapping when he unlawfully restrains another person and when his intent is . . . [t]o inflict bodily injury or to terrorize the victim . . . ." KRS 509.040(1)(c). Conversely, "[a] person is guilty of unlawful imprisonment in the first degree when he knowingly and unlawfully restrains another person under circumstances which expose that person to a risk of serious physical injury." KRS 509.020(1). KRS 509.030(1) states that "[a] person is guilty of unlawful imprisonment in the second degree when he knowingly and unlawfully restrains another person." The difference between first- and second-degree unlawful imprisonment is whether the restraint is "under circumstances which expose that person to a risk of serious physical injury." KRS 509.020(1). "Kidnapping, as the still higher offense, requires an additional intent, including an intent to terrorize or cause bodily injury." *Stinnett v. Commonwealth*, 364 S.W.3d 70, 80 n.4 (Ky. 2011).

During his trial testimony Simpson admitted that he hit A.B., struck her with a candle, and called her hateful names. This demonstrated his intent to inflict bodily injury or terrorize A.B., which supports the kidnapping charge. The evidence would not permit "the jury to rationally find the defendant not guilty of the primary offense, but guilty of the lesser offense." *Roberts v. Commonwealth*, 410 S.W.3d 606, 610 (Ky. 2013). Simpson clearly demonstrated an intent to terrorize and cause bodily injury to A.B. given the hours of assault and berating that A.B. endured. In considering the totality of

9

the evidence, the trial court did not abuse its discretion and properly denied Simpson's request to include instructions for first- and second- degree unlawful imprisonment.

### c. Simpson was not entitled to a fourth-degree assault instruction as a lesser-included offense to second-degree assault.

Simpson also claims he was entitled to an instruction on fourth-degree assault as a lesser-included offense of second-degree assault. The trial court denied Simpson's request and reasoned that his use of the candle to hit A.B. made it less likely that the elements of fourth-degree assault could be satisfied. He argues the jury could have found him not guilty of second-degree assault and guilty of fourth-degree assault if it believed he acted recklessly rather than intentionally when he caused physical injury to A.B. by means of a deadly weapon or dangerous instrument.

KRS 508.020(1)(b), the second-degree assault statute, provides in relevant part that a person is guilty of second-degree assault when "[h]e intentionally causes physical injury to another person by means of a deadly weapon or a dangerous instrument." "Dangerous instrument" is defined as "any instrument, . . . article, or substance which, under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or serious physical injury." KRS 500.080(3). The second-degree assault jury instruction directed the jury to find Simpson guilty if it believed beyond a reasonable doubt that Simpson intentionally caused physical injury to A.B. by using a knife, candle, and/or glass cup, and that the knife, candle, and/or glass cup constituted a dangerous instrument.

10

Fourth-degree assault differs from second-degree assault in that it requires a lower degree of culpability to establish its commission. A person is guilty of second-degree assault when he **intentionally** causes physical injury to another person, and guilty of fourth-degree assault when, "[w]ith **recklessness** he causes physical injury to another person by means of a deadly weapon or dangerous instrument." KRS 508.030(1)(b) (emphasis added). During his testimony, Simpson admitted to hitting A.B. intentionally. On cross-examination, Simpson admitted that he told the investigating detective that he struck A.B. with a candle. When the Commonwealth asked, "you assaulted her by hitting her with a candle, correct?" Simpson responded in the affirmative. Simpson stated he wanted A.B. to feel the same emotional pain he was feeling. As the trial court concluded, a reasonable juror could not find that Simpson's conduct was merely reckless. As such, the trial court did not abuse its discretion in declining to give a fourth-degree assault instruction.

### d. Simpson was not entitled to any extreme emotional disturbance instructions.

Simpson also argues to this Court that because he was potentially acting under an extreme emotional disturbance (EED), he lacked the requisite intent to commit the primary crimes of burglary, kidnapping, and second-degree assault. Specifically, Simpson asserts that it would have been reasonable for the jury to believe his actions were driven by an EED created by his discovery of the photo of A.B. in bed with another man. While Simpson admits he did not argue before the trial court that he acted under EED when he assaulted, strangled, and abused A.B., he asserts that it would have been reasonable for

11

the jury to believe Simpson's actions were driven by EED created by his discovery of the photo showing A.B. in bed with another man.

These unpreserved errors are limited to palpable error review. Under RCr 10.26, "[a] palpable error which affects the substantial rights of a party may be considered . . . by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error." Palpable error review allows reversal when "manifest injustice has resulted from the error." *Elery v. Commonwealth,* 368 S.W.3d 78, 98 (Ky. 2012) (quoting RCr 10.26). Such an injustice occurs when there is a "probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law." *Martin v. Commonwealth,* 207 S.W.3d 1, 3 (Ky. 2006). "When an appellate court engages in a palpable error review, its focus is on what happened and whether the defect is so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process." *Id.* at 5.

To support his argument, Simpson cites KRS 508.040(1), which states, "[i]n any prosecution under KRS 508.010, 508.020 or 508.030 in which intentionally causing physical injury or serious physical injury is an element of the offense, the defendant may establish in mitigation that he acted under the influence of extreme emotional disturbance, as defined in subsection (1)(a) of KRS 507.020." The legislature has specifically provided that EED may mitigate first-, second- and fourth-degree assaults. This statute simply has no

12

application to a burglary offense.  *See Hughes v. Commonwealth,* 2002-SC-1081-MR, 2004 WL 2624053, at *6 (Ky. Nov. 18, 2004) (reasoning that EED was not a defense to burglary and unlawful imprisonment).  Likewise, EED does not mitigate a kidnapping offense.  As such, no palpable error occurred in the trial court's failure to provide an EED instruction in conjunction with the burglary and kidnapping charges.

Simpson also argues that if he was acting under EED, the jury may have believed he acted recklessly, thus entitling him to a fourth-degree assault instruction, and not intentionally, as the offense of second-degree assault requires.  KRS 508.040(1) states, "[i]n any prosecution under KRS 508.010, 508.020 or 508.030 in which intentionally causing physical injury or serious physical injury is an element of the offense, the defendant may establish in mitigation that he acted under the influence of extreme emotional disturbance, as defined in subsection (1)(a) of KRS 507.020."  The legislature has specifically provided that EED may mitigate first-, second- and fourth-degree assaults.  However, Simpson did not tender an EED instruction to the trial court.  Because this claim of error is reviewed for palpable error, and given Simpson's own admissions during his trial testimony, we cannot say that "manifest injustice has resulted . . . ."  *Elery,* 368 S.W.3d at 98 (quoting RCr 10.26).

## II. The trial court did not err in allowing a barrier to be placed between Simpson and A.B. during her testimony.

During A.B.'s testimony, the trial court took a break.  Upon returning, the Commonwealth advised the trial court that it had been notified by attorneys in the audience and court personnel that Simpson was

13

"communicating with the witness while [the attorneys] were at the bench during defense's objection." The Commonwealth believed this was an inappropriate attempt to influence A.B.'s testimony, so it asked the trial court to instruct Simpson to have no communication with the witness. The Commonwealth also requested that a television be placed between Simpson and A.B. so he could not try to communicate with her anymore and suggested that Simpson could watch the witness on the television to maintain his confrontation rights.

Defense counsel was unaware of the communication and objected on confrontation grounds. The trial court admonished Simpson not to communicate with A.B., allowed the television to be placed between them, and advised Simpson that he could watch A.B.'s testimony on the television monitor. Simpson argues the trial court erred when it granted the Commonwealth's motion over defense counsel's objection to place a barrier between Simpson and A.B. while she testified. More specifically, Simpson contends there was no compelling need, and that the placement of the screen violated his constitutional confrontation rights.

The Sixth Amendment to the United States Constitution provides that a criminal defendant has the right "to be confronted with the witnesses against him." *Howard v. Commonwealth,* 595 S.W.3d 462, 474 (Ky. 2020) (citing *Sparkman v. Commonwealth,* 250 S.W.3d 667, 669 (Ky. 2008)). Similarly, Section 11 of the Kentucky Constitution states that the accused has the right "to meet the witnesses face to face." We review this issue

14

for an abuse of discretion. *Walker v. Commonwealth,* 548 S.W.3d 250, 252 (Ky. 2018). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English,* 993 S.W.2d at 945.

In *Walker,* the victim was sexually assaulted by the defendant numerous times over a span of six years. 548 S.W.3d at 251. The victim, who was seventeen years old during the trial, became upset while testifying for the Commonwealth. *Id.* at 252. After a brief recess, the trial court allowed a moving television cart to be placed between the victim and the defendant for the remainder of her testimony over defense counsel's objection. *Id.* On appeal, this Court upheld the trial court's decision and emphasized that the defendant could clearly hear the victim's testimony, and that the trial court's decision did not interfere with his right to confer with counsel or cross-examine the witness. *Id.* at 253. Additionally, the accommodation was due to the fact that the witness had an emotional breakdown. *Id.*

"[W]hile face-to-face confrontation is preferred, the primary right secured by the Confrontation Clause is that of cross-examination. Accordingly, the right to confront is not absolute and may be limited to accommodate legitimate competing interests." *Howard,* 595 S.W.3d at 474 (citing *Sparkman,* 250 S.W.3d at 669). Here, Simpson was not denied the ability to hear the witness, observe the witness on the screen, confer with counsel, or cross-examine A.B. Further, the Commonwealth asserts that A.B. was having emotional breakdowns on the stand. The television being placed between Simpson and

15

A.B. was a reasonable accommodation, particularly considering Simpson's attempts to communicate with A.B. while she was on the stand. As such, the trial court did not abuse its discretion in allowing the accommodation.

### III. The trial court did not err in allowing demonstrative evidence about the nature of A.B.'s injuries.

Simpson argues that the trial court erred by allowing introduction of a photograph that showed A.B. demonstrating to a registered nurse, on a model head and neck, how Simpson grabbed her around the neck with both hands when he strangled her. The nurse testified about the injuries she observed and documented while A.B. was examined at the hospital, which included bruising, trouble swallowing, vomiting, and petechiae in and around her eyes and on her face. She also testified as to the information A.B. relayed to her regarding the cause of her injuries. When shown the photo of A.B. demonstrating the strangulation, the nurse affirmed that the photo accurately depicted how A.B. demonstrated that Simpson strangled her that morning.

Simpson concedes that this issue was not preserved, and therefore requests palpable error review. Under RCr 10.26, "[a] palpable error which affects the substantial rights of a party may be considered . . . by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error." Palpable error review allows reversal when "manifest injustice has resulted from the error." *Elery,* 368 S.W.3d at 98 (quoting RCr 10.26). Such an injustice occurs when there is a "probability of a different result or error so fundamental as to threaten a defendant's

16

entitlement to due process of law." *Martin,* 207 S.W.3d at 3. "When an appellate court engages in a palpable error review, its focus is on what happened and whether the defect is so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process." *Id.* at 5.

The admissibility of demonstrative evidence is not specifically addressed by the Kentucky Rules of Evidence (KRE). *Rankin v. Commonwealth,* 327 S.W.3d 492, 498 (Ky. 2010). Instead, such evidence is subject to the general rules of relevance contained in KRE 402 and 403. Evidentiary rulings are reviewed for abuse of discretion. We must determine whether the trial court's decision was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English*, 993 S.W.2d at 945. Demonstrative evidence must be relevant, and "[r]elevant evidence is evidence that has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more . . . or less probable than it would be without the evidence.'" *Davis v. Commonwealth,* 147 S.W.3d 709, 727 (Ky. 2004) (quoting KRE 401). Relevant evidence is generally admissible, "unless its probative value is substantially outweighed by its unduly prejudicial effect." *Rankin,* 327 S.W.3d at 498.

Here, the photo depicted A.B. placing her hands around the model's neck to show the nurse how she was strangled by Simpson. Having A.B. demonstrate the strangulation was a tool used by the nurse in treating A.B.'s injuries while A.B. was at the hospital shortly after the attack. The demonstration also allowed A.B. to indicate the nature of the particular injuries

17

she suffered, and during trial the nurse used the photo as a visual aid to explain how A.B. was injured.

In *Daniel v. Commonwealth,* 607 S.W.3d 626, 641 (Ky. 2020), the trial court allowed a Styrofoam head to be used by a witness for demonstrative purposes. During her testimony, a doctor used the model head to demonstrate approximately where the entrance wound was and the general trajectory of the bullet. *Id.* The Court held that the evidence served as an appropriate visual aid and the trial court did not abuse its discretion in allowing the evidence. *Id.* at 642-43. Similarly, in *Stringer v. Commonwealth,* this Court upheld a witness's use of anatomically correct dolls while testifying as to the acts the defendant perpetrated on her. 956 S.W.2d 883, 886-87 (Ky. 1997). Like *Stringer,* the victim here used the demonstrative evidence as a visual aid to explain to the nurse how she was hurt. Further, like *Daniel,* the photograph was used as a visual aid by the nurse in describing the nature and extent of A.B.'s injuries to the jury.

Simpson argues that even if the photo was relevant, it was redundant to A.B.'s trial testimony and that the undue prejudice outweighed any probative value the evidence presented. We disagree. The photo and accompanying testimony were provided to further describe the way in which A.B. was strangled. As such, it was clearly relevant to explaining the crimes that occurred.

18

## IV. Allowing Simpson to appear in handcuffs during the penalty phase was error, but harmless.

Next, Simpson claims that palpable error occurred when he was forced to wear handcuffs during the penalty phase, including while giving mitigating testimony. To reiterate, palpable error review allows reversal when "manifest injustice has resulted from the error." *Elery,* 368 S.W.3d at 98 (quoting RCr 10.26). Such an injustice occurs when there is a "probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law." *Martin,* 207 S.W.3d at 3.

RCr 8.28(5) provides that "[e]xcept for good cause shown the judge shall not permit the defendant to be seen by the jury in shackles or other devices for physical restraint." In *Barbour v. Commonwealth,* 204 S.W.3d 606, 612 (Ky. 2006), this Court interpreted RCr 8.28(5) and its prohibition on shackling "to all jury-observed aspects of a criminal trial" and determined that shackling is only permitted in "extraordinary circumstances." This includes the penalty phase, absent a trial court determination that restraints are justified by a state interest specific to a particular trial. *Deal v. Commonwealth,* 607 S.W.3d 652, 660 (Ky. 2020).

Allowing Simpson to remain in handcuffs during the penalty phase was error. While we give great deference to the trial court's decision to keep a defendant restrained in the presence of the jury, *Barbour,* 204 S.W.3d at 614, there generally must be "substantive evidence or [a] finding by the trial court that Appellant was either violent or a flight risk . . . ." *Id.* Here, there was no such finding made by the trial court, or any indication that Simpson was being

19

violent, disruptive, or otherwise uncooperative. In any event, we do not find this error to be reversible.

During the penalty phase, the Commonwealth introduced evidence about Simpson's past crimes given the PFO conviction. Additionally, Simpson admitted during his guilt phase testimony that he served twenty years in prison for burglary, robbery, and drug possession. When Simpson appeared in handcuffs, the jury had just found him guilty of multiple charges during the guilt phase. While a defendant is entitled to due process throughout the trial, it is unlikely Simpson's appearance in handcuffs during the penalty phase had any bearing on the punishment he ultimately received. Simpson was convicted of serious offenses and had a criminal history, so it is unlikely that wearing handcuffs affected the sentence he received, and it certainly did not rise to the level of manifest injustice constituting palpable error.

### V. No cumulative error occurred.

Finally, Simpson argues cumulative error, "the doctrine under which multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to render the trial fundamentally unfair." *Brown v. Commonwealth,* 313 S.W.3d 577, 631 (Ky. 2010). The only error we identified was Simpson wearing handcuffs during the penalty phase, but that error was not a reversible error. Consequently, there was no cumulative error.

### CONCLUSION

For the foregoing reasons, we affirm the judgment and sentence of the Kenton Circuit Court.

20

All sitting.  Lambert, C.J.; Bisig, Conley, Goodwine, Keller, Nickell, JJ., concur.  Thompson, J., concurs in result only.


COUNSEL FOR APPELLANT:

Steven J. Buck
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Joseph A. Beckett
Assistant Attorney General